Article I, § 1, commands and declares that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Article I, § 5, Cl. 1, commands, in relevant part, that "a Majority of each [House of Congress] shall constitute a Quorum to do Business," excepting therefrom permission to "adjourn from day to day" and "to compel Attendance of its Members, in such Manner, and under such Penalties as each House may provide."

Article I, § 7, Cl. 2, commands, in relevant part, that "[e]very Bill which shall have passed both Houses, shall, before it becomes a Law, be presented to the President of the United States."

Article I, § 7, Cl. 3, commands, in relevant part, that "[e]very ... Resolution ... to which the Concurrence of the Senate and House of Representatives may be necessary ... shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the case of a Bill."

Title 1, United States Code, Section 106, Act of July 30, 1947, Chapter 388, Title I, Ch. 2, § 106, 61 Stat. 634, Pub.L. 80-278, provides, in relevant part, that "[w]hen [a] bill ... shall have passed both Houses, it shall be printed and shall then be called the enrolled bill ... and shall be signed by the presiding officers of both Houses and sent to the President of the United States."

Amendment V to the Constitution commands that "No person shall be held for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in active service in time of War or public danger, nor shall any person be subject to the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without Due Process of law; nor shall private property be taken for public use, without just compensation."

28 USC § 455 (a) states: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

## 3.     STATEMENT OF FACTS

Petitioner was  tried, and    committed into Executive custody  by order of the

United States District Court, acting pursuant to the grant of original jurisdiction

purportedly created by Public Law 80-772, Title 18, United States Code, Section 3231.

*19*

By virtue of the commitment order, Petitioner was committed into the custody of the Attorney General and into the custody of the United States Marshals. See 18 U.S.C. § 4082(a) (repealed) and § 3621(a) (enacted Oct. 12, 1984, and effective Nov. 1, 1987).

The text of the bill, H.R. 3190 as amended, which became Public Law 80-772 (enacting Title 18, United States Code, and especially Section 3231), was **passed only by the Senate and never passed by the House of Representatives**. Moreover, that bill was **never certified as enrolled**, and was surreptitiously signed by the Speaker of the House and President pro tempore of the Senate under purported authority of a concurrent resolution agreed to by a Congress denounced by President Truman as a "'body dominated by men with a dangerous lust for power and privilege,'" 27 Encyclopedia Americana 175 (2005), without **quorums** of the respective Houses sitting. Finally, that bill was mistakenly signed by the President of the United States **after it was misrepresented to him by solitary Officers** as a bill passed by both Houses, which was impossible, since **no Congress was in session**.

For those reasons, Public Law 80-772 which purportedly enacted Title 18, United States Code, Act of June 25, 1948, Chapter 645, 62 Stat. 683 *et seq.* and Section 3231 thereof, 62 Stat. 826, purporting to confer upon "the district courts of the United States … original jurisdiction … of all offenses against the laws of the United States" violates Article I, § 5, Cl. 1, and Article I, § 7, Cls. 2 and 3, and is therefore unconstitutional and *void ab initio*. The district court, which acted against Petitioner, did so **without jurisdiction** and Petitioner's indictment and commitment order is ***void ab initio***, and any imprisonment and confinement thereunder is fundamentally unconstitutional and unlawful.

**4.**        <u>H.R. 3190 In The First Session Of The 80<u>th</u> Congress</u>

<u>H.R. 3190</u> was introduced and committed to the Committee of the entire House of

Representatives on the State of the Union of the First Session of the 80th Congress

entitled "Crimes and Criminal Procedure." <u>See</u> <u>House Report No. 304</u> (April 24, 1947),

p. 1 (App. 67). <u>See also</u> 94 <u>Cong. Rec.</u> D556-D557 (Daily Digest) (charting <u>H.R. 3190</u>)

(App. 65-66). <u>H.R. 3190</u> differed from "five … bills which … preceded it … [because]

it constitute[d] a revision, as well as a codification, of the Federal laws relating to crimes

and criminal procedure." 93 <u>Cong. Rec.</u> 5048-5049 (May 12, 1947) (App. 45-46). The

bill was intended (1) to revise and compile **all** of the criminal law, (2) to "restate[]" and

"consolidate[]" "existing statutes," (3) to "repeal" "obsolete, superseded, redundant and

repetitious statutes," (4) to coordinate the Criminal Code with the "Federal Rules of

Criminal Procedure" formerly enacted, and (5) to "clarify and harmonize" penalties of the

"many acts" passed by Congress which were found to be "almost identical." (<u>Id.</u>) "The

bill was ordered to be engrossed and read a third time, was read a third time, and passed"

the House on May 12, 1947, <u>id.</u>; <u>Journal of the House of Representatives</u> ("<u>House</u>

<u>Journal</u>"), May 12, 1947, pp. 343-344 (App. 4-5); 94 <u>Cong. Rec.</u> D556-D557 (showing

<u>H.R. 3190's</u> only passage by the House of Rep. on May 12, 1947), sent to the Senate and

there "referred … to the Committee on the Judiciary." 93 <u>Cong. Rec.</u> 5121, May 13,

1947 (App. 47); <u>Journal of the Senate</u> ("<u>Senate Journal</u>"), May 13, 1947, p. 252 (App.

10).

As passed and enrolled by the House of Representatives <u>H.R. 3190</u> included at

section 3231, Subtitled "District Courts," the following text:

> Offenses against the United States shall be cognizable in
> the district courts of the United States, but nothing in this
> title shall be held to take away or impair the jurisdiction of

21

the courts of the several states under the laws thereof.

H.R. 3190 as passed by the H. of Rep., p. 367, § 3231 (App. 110).  See United States v. Sasscer, 558 F. Supp. 33, 34 (D.MD. 1982).

On July 27, 1947, Congress adjourned without the Senate passing H.R. 3190.  See 93 Cong. Rec. 10439, 10522 (July 26, 1947) (App. 48-49).  On November 17, 1947, Congress reconvened pursuant to a Presidential proclamation.  Yet, Congress again "adjourned *sine die* on December 19, 1947," without the Senate passing H.R. 3190. Kennedy v. Sampson, 511 F.2d 430, 444 Appendix n. 4 (D.C. Cir. 1974).

### 5.  H.R. 3190 In Second Session Of The 80th Congress

The Senate Committee on the Judiciary reported amendments to H.R. 3190 on June 14, 1948, under Sen. Rep. No. 1620.  94 Cong. Rec. 8075 (June 14, 1948) (App. 50); Senate Journal, June 14, 1948, p. 452 (App. 34).  Sen. Rep. No. 1620 contained "a large volume of amendments" and "the new Federal Rules of Criminal Procedure [were] keyed to the bill and [were] reflected in part II of [the new proposed] title 18."  Heralding that, upon passage of the amended bill, "[u]ncertainty will be ended," the Senate wanted "the amendments adopted en bloc," including a new jurisdictional section for Title 18.  94 Cong. Rec. 8721 (App. 51).  The report contained only the proposed amendments.  See Sen. Rep. No. 1620, pp. 1 & 4 (App. 103-104).

"[T]he amendments were considered and agreed to en bloc" and then "ordered to be engrossed."  94 Cong. Rec. 8721-8722 (June 18, 1948) (App. 51-52), Senate Journal, June 18, 1948, p. 506 (H.R. 3190, "as amended," passed the Senate) (App. 37).  It was moved that "the Senate insist upon its amendments" by the House (94 Cong. Rec. at 8722); and "[o]rdered that the Secretary request the concurrence of the House of

22

Representatives in the amendments." Senate Journal, supra, p. 506; House Journal, June 18, 1948, p. 688 (App. 16).

The House received the proposed amendments. The Clerk "read the Senate amendments" collectively into the record with which the House concurred. 94 Cong. Rec. 8864-8865 (June 18, 1948) (App. 53-54); House Journal, June 18, 1948, p. 704 (the "said Senate amendments were concurred in") (App. 17). Although "[t]he House agreed to the amendments to … H.R. 3190," Senate Journal, June 18, 1948, p. 510 (App. 38), no action was taken on H.R. 3190 as amended. The Journal of the House of Representatives is **devoid of any vote** on H.R. 3190 itself on June 18, 1948, and thereafter through adjournment on June 20, 1948. Moreover, the official historical chart of H.R. 3190 clearly shows the *only* passage by the House of Representatives occurring on May 12, 1947, and specifically references volume 93, page 5048 of the Congressional Record as the recorded date the House passed the bill. 94 Cong. Rec. D556-D557 (Daily Digest).

6.      **Congress Agreed By Resolution To Continue Legislative Business By A Single Officer Of Each House During** Adjournment

On June 19, 1948, the House submitted and agreed to concurrent resolutions H.Con.Res. 218 and 219 and requested concurrence by the Senate. House Journal, June 19, 1948, pp. 771-772 (App. 19-20); Senate Journal, June 18, 1948, p. 577 (App. 39). "[T]he Senate [then] passed without amendment these concurrent resolutions of the House." 94 Cong. Rec. 9349 (App. 57). H.Con.Res. 218 "provid[ed] adjournment of the two Houses of Congress until December 31, 1948," id.; see Concurrent Resolutions, Second Session, Eightieth Cong., H.Con.Res. 218, June 20, 1948, 62 Stat. 1435-1436 (App. 105-106). H.Con.Res. 219 "authorize[ed] the signing of enrolled bills following

23

adjournment," 94 Cong. Rec. 9349, specifically resolving:

> That notwithstanding the adjournment of the two Houses
> until December 31, 1948, the Speaker of the House of
> Representatives and the President pro tempore of the
> Senate be, and they are hereby, authorized to sign enrolled
> bills and joint resolutions duly passed by the two Houses
> and found truly enrolled.

See Concurrent Resolutions, supra, H.Con.Res. 219, June 20, 1948, 62 Stat. 1436.

Congress adjourned on June 20, 1948, pursuant to H.Con.Res. 218. 94 Cong. Rec. 9348, 9169 (App. 56, 55); House Journal, June 20, 1948, p. 775; Senate Journal, June 20, 1948, p. 578 (App. 40). Both Houses reconvened on July 26, 1948, pursuant to a proclamation of President Truman. Senate Journal, July 26, 1948, p. 593 (showing reconvention); House Journal, July 26, 1948, pp. 792-793 (same).

### 7. Post-Adjournment Signing Of H.R. 3190 By Single Officers Of The Houses, Presentment To & Approval Thereof By The President Pursuant To H.Con.Res. 219

With both Houses adjourned, with no quorum, disassembled and dispersed, Mr. LeCompte, the Chairman of the Committee on House Administration reported that that committee had found H.R. 3190 "truly enrolled." House Journal, legislative day of June 19, 1948, p. 776 (recorded under heading "BILLS AND JOINT RESOLUTIONS ENROLLED SUBSEQUENT TO ADJOURNMENT") (App. 22). He attached his certificate of enrollment to the **original** H.R. 3190 passed by the House on May 12, 1947. See H.R. 3190, certified after adjournment as "truly enrolled" (as certified by Richard H. Hunt, Director, Center for Legislative Archives, The National Archives, Washington, D.C.) (App. 107-113). Although never certified as truly enrolled, the Speaker and President pro tempore respectively signed the Senate's amended H.R. 3190 on June 22 and 23, 1948. 94 Cong. Rec. 9353-9354 (App. 58-59); House Journal, legislative day

24

June 19, 1948, p. 777 (App. 23); Senate Journal, legislative day June 18, 1948, pp. 578-
579 (App. 40-41).  National Archives & Records Adm. Cert., H.R. 3190 signed by House
and Senate officers and President Truman (App. 114-117).  The Senate's amended H.R.
3190 was presented by the Committee on House Administration to Pres. Truman, June
23, 1948, who signed it June 25, 1948,  12:23 P.M. E.D.T., 94 Cong. Rec. 9364-9367
(App. 61-64); House Journal, legislative day June 19, 1948, pp. 778, 780-782 (App. 24,
25-27); Senate Journal, legislative day of June 18, 1948, pp. 579, 583 (App. 41, 43).
Natl. Archives & Records Adm. Cert., H.R. 3190, supra; 94 Cong. Rec. D557 (Daily
Digest).

### 8.  The Signatories Of H.R. 3190 Knew the Enacting Clause Was False When Signed

Public Law 80-772 stated that the enactment proceeded "by the Senate and House
of Representatives of the United States of America *in Congress assembled.*"  See
National Archives & Records Adm. Cert., H.R. 3190 as signed into P.L. 80-772, supra.
Each signatory knew that neither "House" legislatively existed at that time, and the
legislative process had ceased within the terms of Article I, §§ 5 and 7 on June 20, 1948.

### 9.  *Public Law 80-772* Is Unconstitutional And *Void* Because H.R. 3190 Never Passed Both Houses As Required By Article I, Section 7, Clause 2

#### a.    THE LEGAL PRINCIPLES

This case presents the "profoundly important issue,"  of the constitutionality of an
act of Congress – matters "'of such public importance as to justify deviation from normal
appellate practice and to require immediate determination by this Court.'"  Clinton, 524
U.S. at 455 (Scalia, J., and O'Conner, J., joining in part and dissenting in part) (adopting
language directly from Sup. Ct. R. 11).

25

Although "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives," (Art. I, § 1, U.S. Constitution), "when [Congress] exercises its legislative power, it must follow the 'single, finely wrought and exhaustively considered procedures' specified in Article I." Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc., 501 U.S. 252, 274 (1991) (quoting INS v. Chadha, 462 U.S. at 951). Article I establishes "just how those powers are to be exercised." INS v. Chadha, 462 U.S. at 945.

An act of Congress "does *not* become a law unless it follows each and every procedural step chartered in Article I, § 7, cl. 2, of the Constitution." Landgraf v. USI Film Products, 511 U.S. 244, 263 (1994) (citing INS v. Chadha, 462 U.S. at 946-951 (emphasis added)); Clinton, 524 U.S. at 448 (noting requisite "steps" taken before bill may "'become a law'" and holding that a procedurally defective enactment cannot "'become a law' pursuant to the procedures designed by the Framers of Article I, § 7, of the Constitution").

The Constitution requires "three procedural steps": (1) a bill containing its *exact text* was approved by a majority of the Members of the House of Representatives; (2) the Senate approved *precisely the same text*; and (3) *that text* was signed into law by the President. "If one paragraph of *that text* had been omitted at *any one of those three stages*, [the] law [in question] would *not* have been validly enacted." Clinton, 524 U.S. at 448 (emphasis added). Between the second and third "procedural steps," the bill "… shall … be presented to the President…" Article I, § 7, Cl. 2.

The text of H.R. 3190 passed by the House of Representatives was the text as it existed on the date of passage – *i.e.*, May 12, 1947. Whereas, the text of the bill passed

by the Senate on June 18, 1948, was H.R. 3190 "as amended." Senate Journal, June 18, 1948, p. 506. Thus, the text of the bills passed by the respective Houses was grossly different and neither bill ever "became a law." Clinton, 524 U.S. at 448.

### 10. Permitting Post-Adjournment Legislative Business Pursuant To H.Con.Res. 219 Violated The Quorum, Bicameral And Presentment Requirements Of Article I Of The Constitution

After Congress adjourned on June 20, 1948, pursuant to H.Con.Res. 219, a single officer of each House of Congress signed *a bill* purporting to be H.R. 3190 on June 22-23, 1948, 94 Cong. Rec. 9354; House Journal, legislative day of June 19, 1948, p. 777; Senate Journal, legislative day of June 18, 1948, pp. 578-579, and presented *that bill* to the President, who signed it on June 25, 1948. 94 Cong. Rec. 9365-9367. Thus, the post-adjournment signature "provision [of H.Con.Res. 219] was an important part of the legislative scheme," leading to the enactment of Public Law 80-772, without which it would never have "become a Law." Bowsher v. Synar, 478 U.S. 714, 728 (1986). Public Law 80-772 *falsely* stated it was "enacted" while both Houses were "in Congress assembled," when in fact Congress was not in session. See National Archives & Records Adm. Cert., H.R. 3190 as signed into P.L. 80-772.

The bill signed was the Senate's amended H.R. 3190 – a bill never certified as "truly enrolled," *compare* Pub.L. 80-772, Enactment Clause & signature pages *with* H.R. 3190, certified as "truly enrolled," supra, and H.Con.Res. 219 never authorized the signing of *unenrolled* bills after adjournment. See H.Con.Res. 219, supra, 62 Stat. 1436.

Article I, § 5, Clause 1 mandates a quorum of both Houses of Congress "to do Business." This constitutional requirement has been enforced by practice, Rules of the Houses, custom, Supreme Court holdings and duly enacted statutes.

27

1 U.S.C. § 101 requires every "enacting clause of all Acts of Congress" to state: "'Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.'" Although the bill after passage by "both Houses" must be "enrolled" following which it "shall be signed by the presiding officers of both Houses and sent to the President of the United States," 1 U.S.C. § 106, the actual procedure is regulated by House rules and established practice. Following passage the "chairman of the Committee on House Administration ... affixes to the bills examined a certificate that the bill has been found truly enrolled," House Doc. No. 769, supra, Stages of a Bill, § 983, No. 16, p. [483] (App. 79), after which the "enrolled bill is first laid before the House of Representatives and signed by the Speaker ... after which it is transmitted to the Senate and signed by the President of that body." Id., No. 17, p. [484] (App. 80).

The Supreme Court in Marshall Field & Co. v. Clark, 143 U.S. 649 (1892), defined the essence of this procedure:

> *The signing* by the Speaker of the House of Representatives, and, by the President of the Senate, *in open session, of an enrolled bill is an official attestation by the two houses* of such bill as one that has passed Congress. It is *a declaration by the two houses*, through their presiding officers, *to the President*, that a bill, thus attested, has received, in due form, *the sanction of the legislative branch* of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him.

143 U.S. at 672 (emphasis added). 1 U.S.C. § 106 codified this implicit constitutional requirement. Reading 1 U.S.C. §§ 101 and 106 together requires that all acts must occur at least through presentment to the President while Congress is in session. That the

28

enrolled bill must be "layed before the House" prior to signing by the Speaker and *then* "transmitted to the Senate" before the signing by the President of that body concludes that the respective Houses *must be in session during this transaction.*

An "adjournment terminates the legislative existence of Congress." <u>Pocket Veto Case</u>, 279 U.S. at 681.  "'Th[e] expression, a "house," or "each house," [when] employed … with reference to the faculties and powers of the two chambers … always means … the constitutional quorum, assembled for the transaction of business, and capable of transacting business.'"  279 U.S. at 683, quoting I <u>Curtis' Constitutional History of the United States</u>, 486 n. 1.  Moreover, the term "'House'" means "the House in session," 279 U.S. at 682, and "'as organized and entitled to exert legislative power,' that is, the legislative bodies 'organized conformably to law for the purpose of enacting legislation.'" <u>Id.</u> (quoting <u>Missouri Pacific Railway Co. v. Kansas</u>, 248 U.S. 276, 281 (1919)).  <u>See also</u> <u>House Doc. No. 355</u>, <u>supra</u>, <u>Hinds' Precedents</u>, § 2939, p. 87 ("'The House is not a House without a quorum'") (App. 87).

No "attestation" or "declaration **by the two houses** … to the President," <u>Field & Co.</u>, 143 U.S. at 672, that <u>H.R. 3190</u> had "passed" Congress during the adjournment was possible because no such "houses" constitutionally existed.  <u>See also</u> <u>United States National Bank of Oregon v. Independent Insurance Agents of America</u>, 508 U.S. 439, 455 n. 7 (1993) (noting that the rule established in <u>Field & Co.</u>, 143 U.S. at 672, made statutory by 1 U.S.C. § 106 turned upon "the 'enrolled bill,' signed in open session by the Speaker of the House of Representatives and the President of the Senate").  Longstanding precedence of the House affirms this.  <u>House Doc. No. 355</u>, <u>supra</u>, <u>Hinds' Precedents</u>, <u>Vol. IV</u>, § 2951, pp. 90-91 (upon "disclos[ure] … that there is not a quorum .., [t]he

29

House thereby becomes **constitutionally disqualified** to do further business") (excepting from disqualification the exceptions stated in Art. I, § 5, Cl. 1) (emphasis added) (App. 88-89); id., § 3458, p. 322 ("The Speaker may not sign an enrolled bill in the absence of a quorum.") (App. 93); id. at § 3486, pp. 332-333 (recognizing enrollment and presentment to the President to be legislative business required to be completed before adjournment) (App. 95-96); id. at § 3487, p. 333 n. 3 (presentment to the President is legislative "business" which must be completed before adjournment) (App. 96); id. at § 4788, p. 1026 ("The presentation of enrolled bills" to the President of the United States is a "transact[ion]" of "business" of the "House.") (App. 100).

Once a bill has passed the House of Representatives it must be printed as an "engrossed bill" which then "shall be signed by the Clerk of the House ... sent to the other House, and in that form shall be dealt with by that House and its officers, and, if passed, returned signed by said Clerk." 1 U.S.C. § 106. In the immediate case H.R. 3190 was passed by the House of Representatives on May 12, 1947, engrossed and sent to the Senate and there referred to the Senate's Committee on the Judiciary. See 93 Cong. Rec. 5048-5049, 5121; Senate Journal, May 13, 1947, p. 252. However, it was not dealt with nor passed "in that form."

Instead, amendments were proposed which were "agreed to en bloc," read into the record and "ordered to be engrossed," 94 Cong. Rec. 8721-8722. Then, "the [amended] bill was read the third time and passed." 94 Cong. Rec. 8722; Senate Journal, June 18, 1948, p. 506. The House then concurred in the amendments en bloc. 94 Cong. Rec. 8864-8865; House Journal, June 18, 1948, p. 704.

"The House in which a bill originates enrolls it," House Doc. No. 769, supra,

*30*

Stages of a Bill, No. 15, p. [483] (App. 79), and, in the case of House bills, the "chairman of the Committee on House Administration … affixes to the bills examined a certificate that the bill has been found truly enrolled," Id., No. 16, p. [483], after which it is "laid before the House … signed by the Speaker [then] transmitted to the Senate and signed by the President of that body." Id., No. 17, p. [484]. Unequivocally, "[t]he Speaker may not sign an enrolled bill in the absence of a quorum." House Doc. No. 355, supra, Hinds' Precedents, § 3458, p. 322. Cf., id., § 2939, p. 87 ("The House is not a House without a quorum.").

The constitutional "quorum" issue is precluded from the Field & Co.'s "enrolled bill rule" by its terms – i.e., "[t]he signing … in open session, of an enrolled bill," 143 U.S. at 672 (emphasis added), which in any case only applies in "the absence of [a] constitutional requirement binding Congress." United States v. Munoz-Flores, supra, 495 U.S. at 391 n. 4. Moreover, just as "§ 7 gives effect to all of its Clauses in determining what procedures the Legislative and Executive branches must follow to enact a law," id., 495 U.S. 386 (emphasis by Court), so too does Article I, § 5, Cl. 1 "provid[e] that no law could take effect without the concurrence of the prescribed majority of the Members of both Houses," INS v. Chadha, 462 U.S. at 949-950, as to all legislative "Business." Cf. United States v. Ballin, 144 U.S. 1, 3-5 (1892) (to determine whether constitutionally mandated quorum was present for legislative action the Court "assume[s]" the Journals of the Houses are to be considered to decide the issue).

The bill signed by the Officers of the Houses, presented to and signed by the President of the United States, was the Senate's amended bill, which never passed the House. H.Con.Res. 219 only "authorized [the] sign[ing] [of] enrolled bills … duly

31

passed by the two Houses and found truly enrolled," H.Con.Res. 219, supra, 62 Stat. 1436, voiding the signatures on the amended bill.

Having not been enrolled, certified as truly enrolled, or signed by the Speaker of the House with a quorum present, the bill was rendered **constitutionally void**. House Doc. No. 769, supra, Constitution of the United States, § 55, p. [19] ("[w]hen action requiring a quorum was taken in the ascertained absence of a quorum … the action was null and void") (App. 74); House Doc. No. 355, supra, Hinds' Precedents, §§ 3497 & 3498, pp. 344-345 (such a bill is "not in force" and is "not a valid statute") (App. 97-98). Cf., id., Hinds' Precedents, § 2962, p. 94 (to vacate legislative act "the absence of a quorum should appear from the Journal") (App. 90).

Art. I, § 7, mandates that a bill that has passed both Houses "'shall before it becomes a Law, be presented to the President of the United States …,'" Art. I, § 7, Cl. 2; INS v. Chadha, 462 U.S. at 945, which "can **only** contemplate a presentment by the Congress in some manner, [because] … [a]t that point the bill is necessarily in the hands of the Congress." United States v. Kapsalis, 214 F.2d 677, 680 (7th Cir. 1954), cert. denied, 349 U.S. 906 (1955) (emphasis added). Thus, presentment is clearly part of the legislative procedure required as essential to enactment of a bill as law. INS v. Chadha, 462 U.S. at 945, 947, 951; La Abra Silver Mining Co. v. United States, 175 U.S. 423, 454 (1899) ("***After a bill has been presented*** to the President, ***no further action is required by Congress*** in respect of that bill, unless it be disapproved by him. …") (emphasis added). See House Doc. No. 355, supra, Hinds' Precedents, Vol. IV, § 4788, p. 1026 (recognizing that "the presentation of enrolled bills" to the President is a "transact[ion]" of "business" of "the House"); id., § 3486, p. 332 (recognizing presentment required prior

32

to adjournment); id., § 3487, p. 333 note 3 (when bill is enrolled or signed by presiding officers "too late to be presented to the President before adjournment" signing and presentment must continue at next session as a "resumption of [legislative] business"). Clearly presentment is part of the constitutionally mandated "Business," Art. I, § 5, Cl. 1, to be "exercised in accord with [the] single, finely wrought and exhaustively considered, procedure" "prescri[bed] … in Art. I, §§ 1, 7." INS v. Chadha, 462 U.S. at 951.

The "draftsmen" of the Constitution "took special pains to assure these [legislative] requirements could not be circumvented. During the final debates on Art. I, § 7, Cl. 2, James Madison expressed concern that it might easily be evaded by the simple expedient of calling a proposal a 'resolution' or 'vote' rather than a 'bill.' As a consequence, Art. I, § 7, Cl. 3, … was added." INS v. Chadha, 462 U.S. at 947 (citing 2 Farrand, supra, 301-302, 304-305).

Whether actions authorized under a resolution are "an exercise of legislative powers depends not on their form but upon 'whether they contain matter which is properly to be regarded as legislative in its character and effect.'" INS v. Chadha, 462 U.S. at 952 (quoting S. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897)). "If the power is legislative, Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, § 7." Metropolitan, 501 U.S. at 276. See also Bowsher v. Synar, 478 U.S. at 756 (Stevens, J., concurring) ("It is settled, however, that if a resolution is intended to make policy that will bind the Nation, and thus is 'legislative in its character and effect,' S. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897) – then the full Article I requirements must be observed. For 'the nature or substance of the resolution, and not its form, controls the question of its disposition.' Ibid.").

33

"'Congress,'" of course, "'cannot grant to an officer under its control what it does not possess.'" Metropolitan, 501 U.S. at 275 (quoting Bowsher v. Synar, 478 U.S. at 726). Congress does not possess the "'capab[ility] of transacting business'" and is not "'entitled to exert legislative power,'" when its "legislative existence" has been "terminate[d]" by an "adjournment." Pocket Veto Case, 279 U.S. at 681-683 (citations omitted). "The limitation of the power of less than a quorum is absolute," House Doc. No. 355, supra, Hinds' Precedents, Vol. V, Ch. CXL, § 6686, p. 851 (App. 102), and includes the signing of an enrolled bill by the Speaker of the House, id., Vol. IV, Ch. XCI, § 3458, p. 322, and presentment to the President of the United States. id., Ch. XCII, §§ 3486, 3487 & 3497, pp. 332, 333 note 3, 344 & 345 (App. 95-98). Wright v. United States, 302 U.S. 583, 600 (1938) (Stone, J., concurring) ("The houses of Congress, being collective bodies, transacting their routine business by majority action are capable of acting only when in session and by formal action recorded in their respective journals, or by recognition, through such action, of an established practice.") Thus, "Congress," as defined by the Constitution and Supreme Court, never "presented" *any* version of H.R. 3190 to the President of the United States.

Whether the action taken under H.Con.Res. 219 was an "exercise of legislative power" depends upon whether it was essentially "legislative in purpose and effect." INS v. Chadha, 462 U.S. at 952. "In short, when Congress '[takes] action that ha[s] the purpose and effect of altering the legal rights, duties, and relations of persons … outside the Legislative Branch,' it must take that action by the procedures authorized in the Constitution." Metropolitan, 501 U.S. at 276, quoting INS v. Chadha, 462 U.S. at 952-955. "If Congress chooses to use a [] resolution … as a means of expediting action, it

34

may do so, if it acts by both houses and presents the resolution to the President,"
Consumer Energy Council of America v. F.E.R.C., 673 F.2d 425, 476 (D.C. Cir. 1982),
aff'd mem. sub nom., Process Gas Consumers Group v. Consumer Energy Council of
America, 463 U.S. 1216 (1983).

The inescapable conclusion as to the "purpose and effect" of H.Con.Res. 219 was
to enact *a bill* the text of which at the time of adjournment on June 20, 1948, had not
been passed by both Houses, enrolled, certified as "truly enrolled," or signed by the
officers of the Houses or presented to the President of the United States with quorums
sitting. In other words, H.Con.Res. 219 unconstitutionally permitted post-adjournment
legislative business to proceed without Congress and upon an unpassed bill. Congress
did not follow the procedures mandated by Art. I, § 7, Cl. 2 and attempted to supersede
the quorum requirements of Art. I, § 5, Cl. 1 *via* a concurrent resolution to carry forth
legislative business with no legislature. The 80th Congress surreptitiously provided a
bill, the text of which had never passed either House "'mask[ed] under … [the] indirect
measure,'" Metropolitan, supra, 501 U.S. at 277 (quoting Madison, The Federalist No.
48, p. 334 (J. Cooke 1961 ed.)), of a resolution purporting to authorize continuing
legislative action during adjournment with no quorum and no Congress of an extra-
congressional bill. Public Law 80-772 did not "become a Law" as required by the
constitutional procedures mandated under Article I, § 5, Cl. 1, and Article I, § 7, Cls. 2
and 3, and is unconstitutional and *void ab initio*.

"[W]hen action requiring a quorum was taken in the ascertained absence of a
quorum … the action [is] null and void," House Doc. No. 769, supra, Constitution of the
United States, § 55, p. [19] (citing Hinds' Precedents, Vol. IV, § 2964), and "a bill … not

35

actually passed [although] signed by the President [is to be] disregarded [requiring] a new bill [to be] passed." House Doc. No. 769, § 103, p. [34] (citing Hinds' Precedents, Vol. IV, § 3498) (App. 75).

**11. The District Court Order Committing Petitioner To Executive Custody Pursuant To § 3231 (Of The Unconstitutional *Public Law 80-772*) Was Issued *Ultra Vires*, Is Unconstitutional And *Coram Non Judice*, And his Imprisonment and Confinement Is Unlawful**

"The challenge in this case goes to the subject-matter jurisdiction of the [district] court and hence [its] power to issue the order," United States Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 77 (1988), committing Petitioner to imprisonment in Executive custody. Thus, the "question is, whether ... [the district court's] action is judicial or extra-judicial, with or without the authority of law to render [the] judgment," Rhode Island v. Massachusetts, 37 U.S. (12 Pet.) 657, 718 (1838), and to issue the commitment order.

Subject-matter jurisdiction means "'the courts' statutory or constitutional *power* to adjudicate the case,'" United States v. Cotton, 535 U.S. 625, 630 (2002), quoting Steel Co. v. Citizens For A Better Environment, 523 U.S. 83, 89 (1998); Rhode Island v. Massachusetts, 37 U.S. (12 Pet.) at 718 ("Jurisdiction is the power to hear and determine the subject-matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them."); Reynolds v. Stockton, 140 U.S. 254, 268 (1891) ("Jurisdiction may be defined to be the right to adjudicate concerning the subject matter in a given case."). "Subject-matter limitations on federal jurisdiction serve institutional interests by keeping the federal courts within the bounds the Constitution and Congress have prescribed." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999).

"'Without jurisdiction the court cannot proceed at all in any cause ... and when it

ceases to exist, the only function of the court is that of announcing the fact and dismissing the cause.'" Steel Co. v. Citizens, 523 U.S. at 94, quoting Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1869); Willy v. Coastal Corp., 503 U.S. 131, 137 (1992) ("lack of subject-matter jurisdiction ... precludes further adjudication"). The Supreme Court has asserted over and over that "[t]he requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" Steel Co., 523 U.S. at 94-95, quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884); See also Insurance Corp. of Ireland, Ltd., 456 U.S. at 702.

Because subject-matter jurisdiction "involves a court's power to hear a case, [and thus] can never be forfeited or waived ... correction [is mandatory] whether the error was raised in district court" or not. United States v. Cotton, 535 U.S. at 630 (citation omitted); Steel Co., 523 U.S. at 94-95 (citing cases). When a district court did "not have subject-matter jurisdiction over the underlying action ... [its] process[es] [are] void and an order of [punishment] based [thereupon] ... must be reversed." United States Catholic Conf., 487 U.S. at 77; Willy v. Coastal Corp., 503 U.S. at 139 ("[T]he [punishment] order itself should fall with a showing that the court was without authority to enter the decree."); Ex parte Fisk, 113 U.S. 713, 718 (1885) ("When ... a court of the United States undertakes, by its process ... to punish a man ... [respecting] an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing ... is equally void.")

Habeas corpus review "is limited to the examination of the jurisdiction of the court whose judgment of conviction is challenged." INS v. St. Cyr, 533 U.S. 289, 311-

37

314 (2001); <u>Bowen v. Johnston</u>, 306 U.S. 19, 23 (1939). A "court 'has jurisdiction to render a particular judgment *only when the offense charged is within the class of offenses placed by the law under its jurisdiction.*'" 306 U.S. at 24 (emphasis added). If it is found that the court lacked jurisdiction to try petitioner, the commitment and imprisonment is void, any judgment is *void* and the prisoner must be discharged. <u>Ex parte Yarbrough</u>, 110 U.S. 651, 654 (1884).

Petitioner has established that the text of <u>H.R. 3190</u> signed by respective House officers and the President of the United States: (1) failed to pass the House of Representatives, and (2) that the legislative process continued after Congress adjourned by single officers of each House acting pursuant to <u>H.Con.Res. 219</u> without quorums in either House, all of which violated Article I, Section 5, Clause 1; Article I, Section 7, Clause 2, and/or Article I, Section 7, Clause 3 – and any of which rendered <u>Public Law 80-772</u> unconstitutional and *void ab initio*. <u>Marbury v. Madison</u>, 5 U.S. 137, 180 (1803) ("a law repugnant to the constitution is *void*; and … courts, as well as other departments, are bound by that instrument"). Therefore, because "the offense[s] charged … [were] placed by the law under [the] jurisdiction," of the district court below pursuant to 18 U.S.C. § 3231 of <u>Public Law 80-772</u>, which is *unconstitutional*, and "*void*, the court was without jurisdiction and the prisoner must be discharged." <u>Yarbrough</u>, 110 U.S. at 654. Since <u>Public Law 80-772</u> has never been enacted as required by Article I, Section 5, Clause 1, and Article I, Section 7, Clauses 2 and 3 thereof, rendering *void ab initio* the jurisdiction by which the district court acted to indict and to imprison Petitioner, to enter any judgment, and order Petitioner imprisoned in Executive custody, the district court's actions were "'*ultra vires*,'" <u>Ruhrgas AG</u>, 526 U.S. at 583 (quoting <u>Steel Co.</u>, 523 U.S. at

38

101-102), and "*coram non judice*." <u>Rhode Island v. Massachusetts</u>, 37 U.S. (12 Pet.) at 720.

The indictment and imprisonment and any judgment thereupon "being without jurisdiction, is *void*, and the order punishing ... is equally *void*." <u>Ex parte Fisk</u>, 113 U.S. at 718; <u>United States Cath. Conf.</u>, 487 U.S. at 77; <u>Willy v. Coastal Corp.</u>, 503 U.S. at 139. This is precisely the office and function of *habeas corpus – i.e.*, to "examin[e] ... the jurisdiction of the court whose judgment of conviction is challenged," <u>Bowen v. Johnston</u>, 306 U.S. at 23, and where, as here, the court was clearly "without jurisdiction ... the prisoner ... must be discharged." <u>Ex parte Yarbrough</u>, 110 U.S. at 654. <u>See also</u> <u>Ex parte Lange</u>, 85 U.S. (18 Wall.) 163, 166 (1874).

## VIII.  ISSUE FOUR:  THE ACTIONS OF THE LOWER COURT JUDGE VIOLATE 28 USC §455

Federal Courts are courts of limited jurisdiction, *e.g.*, <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994), and a ruling that <u>Public Law 80-772</u> is unconstitutional will arguably render every federal district court judge civilly liable for every exercise of jurisdiction pursuant to 18 U.S.C. § 3231. <u>See</u> <u>Stump v. Sparkman</u>, 435 U.S. 349, 358-359 (1978). Judges of courts of limited jurisdiction have been held civilly liable upon void jurisdiction. Even Circuit Court and Supreme Court Justices arguably have the same potential conflict, but for the reasons stated below Supreme Court justices must be excepted from the prohibitions of 28 U.S.C. § 455 and Due Process of Law.

"[T]he sensitivity of the issues" requires "address[ing] the applicability of [28 U.S.C.] § 455 with the same degree of care and attention ... employ[ed] [upon an] assert [ion] that the District Court[s] lacked jurisdiction or that § 455 mandates disqualification of all [district] judges ... without exception." <u>United States v. Will</u>, 449 U.S. 200, 217

39

(1980) (brackets supplying immediate circumstances).  The purpose "of § 455 is to guarantee litigants a fair forum," Id., "to promote public confidence in the integrity of the judicial process," Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860 (1988) (citing S. Rep. No. 93-417, p. 5 (1973); H.R. Rep. No. 93-1453, p. 5 (1973)), and to provide "positive disqualification by reason of … the appearance of possible bias." Will, 449 U.S. at 216; Liteky v. United States, 510 U.S. 540, 553 n. 2 (1994) (same); Liljeberg, 486 U.S. at 859-860 & n. 8 (same).

"[A]rgu[ably] … a [district] judge will feel the motivation to vindicate a prior conclusion," Liteky, 510 U.S. at 562, thereby creating an appearance of impropriety due to partiality.  The "integrity of a fellow member," 486 U.S. at 865-866 n. 12, of a district court hearing these claims "is unlikely to quell the concerns of the public," id., and such "suspicions and doubts" shadow these proceedings.  Liljeberg, 486 U.S. 865-866 & n. 12. "People … are too often all too willing to indulge suspicions and doubts concerning the integrity of judges." Id.

Due process of law "demarks the outer boundaries of judicial disqualifications," Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 828 (1986), requiring fairness in fact and "'the appearance of justice.'" In re Murchison, 349 U.S. 133, 136 (1955) (quoting Offutt v. United States, 348 U.S. 11, 14 (1954)).  This Court is "not required to decide whether in fact" all district judges suffer such conflict, "but only whether sitting on the case … "'would offer a possible temptation to the average … [district] judge to … lead him not to hold the balance nice, clear and true.'"'" Aetna, 475 U.S. at 825 (citations omitted).  To permit district court judges to hear this petition would be "a plain violation of the statute [§ 455]," Liljeberg, 486 U.S. at 861, and could never "'satisfy the appearance of justice.'"

40

Murchison, 349 at 146. At a minimum, it would raise constitutional questions which should be avoided. See, e.g., Richardson v. United States, 526 U.S. 813, 830 (1999); Gomez v. United States, 490 U.S. 858, 864 (1989).

"Although it is clear that the District Judge[s] and all Justices of this Court have a [] [probable] interest in the outcome in [this] case[], there is no doubt whatever as to this Court's jurisdiction or that of the District Courts under 28 U.S.C. § [2241 (a)]." Will, 449 U.S. at 210-211 (bracketing jurisdictional statute in this case). Unlike the parties in Will, the district court should disqualified itself to hear this petition.. Id. Will held the "Rule of Necessity" required the District Judge and the Justices to hear the case regardless of interests as no substitute district judge was available. 449 U.S. at 212.

The Justices of the Supreme Court are furthest from the operation of Section 3231 and have no peer pressures. Thus, "'[t]he biasing influence … [is] too remote and insubstantial to violate constitutional constraints.'" Aetna, 475 U.S. at 826 (quoting Marshall v. Jerrico, Inc., 446 U.S. 238, 243 (1980)). Cf. Tumey v. Ohio, 273 U.S. 510, 531 (1927) (citing Cooley, Const. Limitations 594 (7th ed. 1903)) (qualifying remoteness of interest). The Supreme Court Justices can not realistically be held liable by private parties, if, for no other reason, because the Supreme Court is essential to the tripartite Government established by Article III of the Constitution, whereas, district courts and appellate courts are created at Congress' discretion. Whether district judges and appellate judges will ultimately be held liable must await its own day in court. It suffices that they could be. See, e.g., Bradley v. Fisher, 80 U.S. 335 (1872).

To insure exhaustion, Petitioner first presents the petition to the District Court. If the District Court hears the petition and does not forward it to the Supreme Court for

41