amount each year for the development of farm-to-market roads. The Commissioner of Public Roads, Mr. Thomas H. MacDonald, spoke in favor of the bill. General Fleming, Commissioner of Public Works, favored the bill. No one appeared in opposition to the bill. It was reported unanimously by the Public Works Committee. Three identical bills have been introduced in the other body by three different Senators. The President recommended the passage of such measure in his message to the Congress on January 3 of this year. This bill will not require a single dollar of appropriations from the Federal Treasury.

Mr. CASE of South Dakota. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. CASE of South Dakota. Does the extension apply to the farm-to-market roads as well as to the primary system?

Mr. CUNNINGHAM. It certainly does, as well as the development of the highways in the urban areas.

Mr. CASE of South Dakota. The bill is very much in order for two reasons. One is that the time when the Japanese war expired, creating the resolution which the gentleman has referred to before, came along in the fall, which gave the States a short year the first year.

Mr. CUNNINGHAM. Yes. No States started building highways prior to October of 1945. They lost 4 months to start with. Then, there was a lack of material and shortage of labor and high prices, which caused the program to be held up. The whole program will be retarded and the States will lose some of this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status quo until the Congress took some additional action.

Mr. COLE of New York. Mr. Speaker, I withdraw my reservation of objection.

Mr. ANGELL. Mr. Speaker, reserving the right to object, as one of the members of this committee, I had an opportunity to study this bill very carefully. The people in my particular area in the Northwest are very, very much in sympathy with this bill. I think what the chairman has said and what the gentleman from Iowa [Mr. CUNNINGHAM] has said is absolutely true, that this bill is essential for our road-building program.

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That paragraph (d) of section 4 of the Federal-Aid Highway Act of 1944, Public Law 521, Seventy-eighth Congress, approved December 20, 1944, is hereby amended by striking out the term "one year" where it appears in said paragraph and inserting in lieu thereof the term "two years."

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

TO CODIFY TITLE 18 OF THE UNITED STATES CODE, CRIMES AND CRIMINAL PROCEDURE

The Clerk called the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code entitled "Crimes and Criminal Procedure."

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill the second time.

Mr. WALTER. Mr. Speaker, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: On page 434, line 11, after the word "of", strike out "three" and insert "five."

Mr. WALTER. Mr. Speaker, the amendment you have just heard reported would have the effect, if adopted, of increasing the membership of the parole board from three to five.

At the last session of the Congress one of the subcommittees of the Committee on the Judiciary, in studying the legislation which we hoped might have the effect of cutting down the criminal rate in this country, found a perfectly appalling situation in the parole board. That board of three members actually interviews upward of 10,000 prisoners each year. That is, personal interviews. In addition to that, they have to review the cases acted on after personal interviews.

There are 21 criminal institutions in the United States that must be visited by this Board at regular intervals. So they have a perfectly impossible job with the result that men are paroled according to formula who should be compelled to serve their full sentence. I am not thinking about those men who are eligible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases; that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 28.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-ninth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that have assisted in the preparation of the original United States Code and every supplement and new edition of that code. These companies have worked continuously and closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committees. In turn, the companies supplemented their regular editorial staffs by engaging the services of a reviser who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and testified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by these various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through its chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in substantive law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously endorsed the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of careful and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.

XCIII——319

This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to those numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-ninth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of procedure or objection to it, but it does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that they were purely a codification. But there are some changes in this bill (H. R. 3198), I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. Those laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of them the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. Is the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 38, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part

those employees who have not left the Federal Government, and who do not do so by the time this pending legislation is enacted. The violation of a covenant does not become either moral or ethical simply because it is done by legislation.

The major purpose of the bill S. 637 is to liberalize retirement benefits. It is incompatible with that purpose to break a covenant already made with employees now working, and take away from them retirement rights which they now have. It would be far more logical to provide for the commencement of retirement benefits at the age of 60, irrespective of whether a person is voluntarily or involuntarily separated from Government service.

I have prepared two proposed amendments to the bill S. 637, which have been printed.

The first of these two amendments would do what I have just proposed: It would substitute the age of 60 years, throughout the bill, as the age at which retirement benefits are to begin. It would also cover the case of an employee who is forced to retire voluntarily at an earlier age than the retirement age, by permitting him to begin drawing a reduced annuity at the age of 55, or thereafter, computed on an actuarial basis.

I think this amendment is entirely equitable, and I should be glad to see it adopted. However, I do not intend to press it. Speaking frankly, I have been told that the offering of any amendments to this bill would result in defeating the bill, and I should not wish to be responsible for such an eventuation.

The second amendment which I sent to the desk, and which has been printed, was not intended to be offered unless the first amendment should have been defeated. Since I have decided not to press the first amendment, neither shall I press the second.

This second amendment treats only with the discrimination and equity between voluntary and involuntary retirement; and its sole effect would be to provide that an employee who has served the number of years entitling him to receive retirement benefits can begin to receive those benefits at the age of 62, regardless of whether his retirement is voluntary or involuntary.

Employees who left their jobs with old-line Government agencies, during the time when OPA and other war agency staffs were being recruited, and took positions with the newer agencies at salary increases ranging from one-third to 40 or even 50 percent above the salaries they were previously receiving, and who now face involuntary separation from the service as the wartime agencies are liquidated, are actually getting a special bonus when their agency ceases to exist, by being allowed the full deferred annuity at the age of 62, while those who stayed on the job in the old-line agencies are told they cannot receive a deferred annuity until they reach the age of 65. The migrant workers got higher salaries all during the war years, and they will get higher retirement benefits because of those higher salaries.

Both voluntary and involuntary separation, except for cause, should receive the same treatment in the Government's retirement system. No logical argument to the contrary can be offered, and no such argument was offered at the hearings on the bill S. 637.

I have made this statement to the Senate because I had already sent forward these two amendments, and they had been printed at my request; and I felt the Senate was entitled to an explanation of why I had prepared these amendments and what they were designed to accomplish. I felt, also, that the Senate was entitled to notice that I have decided not to press these amendments.

HOUSE BILLS REFERRED

The following bills were severally read twice by their titles, and referred, as indicated:

H.R. 84. An act to amend the Nationality Act of 1940, as amended;

H.R. 1467. An act to amend the act entitled "An act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes," of June 15, 1917, as amended, and the Alien Registration Act, 1940, to increase the penalties for violation of such acts;

H.R. 1565. An act to codify and enact into positive law, title 1 of the United States Code, entitled "General Provisions";

H.R. 1566. An act to codify and enact into positive law, title 4 of the United States Code, entitled "Flag and Seal, Seat of Government, and the States";

H.R. 1567. An act to codify and enact into positive law, title 6 of the United States Code, entitled "Official and Penal Bonds";

H.R. 2083. An act to codify and enact into positive law, title 17 of the United States Code, entitled "Copyrights";

H.R. 2084. An act to codify and enact into positive law, title 9 of the United States Code, entitled "Arbitration";

H.R. 2237. An act to correct an error in section 342 (b) (8) of the Nationality Act of 1940, as amended; and

H.R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure"; to the Committee on the Judiciary.

H.R. 289. An act to further perfect the consolidation of the Lighthouse Service with the Coast Guard;

H.R. 2054. An act to amend the act of April 14, 1930, to provide increased retired pay for certain members of the former Life Saving Service;

H.R. 2331. An act to amend section 20a of the Interstate Commerce Act; and

H.R. 2654. An act to authorize the Secretary of the Treasury to grant to the mayor and City Council of Baltimore, State of Maryland, a permanent easement for the purpose of installing, maintaining, and servicing a subterranean water main in, on, and across the land of the United States Coast Guard station called Lazaretto depot, Baltimore, Md.; to the Committee on Interstate and Foreign Commerce.

H.R. 1179. An act to aid in defraying the expenses of the Seventeenth Triennial Convention of the World's Woman's Christian Temperance Union to be held in this country in June 1947; to the Committee on Foreign Relations.

H.R. 1203. An act to provide compensation to persons performing the duties of postmasters at post offices of the fourth class during annual and sick leave of the postmasters; to the Committee on Civil Service.

H.R. 1287. An act to regulate the marketing of economic poisons and devices, and for other purposes; to the Committee on Agriculture and Forestry.

H.R. 1862. An act to permit certain naval personnel to count all active service rendered under temporary appointment as warrant or commissioned officers in the United States Navy and the United States Naval Reserve, or in the United States Marine Corps and the United States Marine Corps Reserve, for purposes of promotion to commissioned warrant officer in the United States Navy or the United States Marine Corps, respectively; and

H.R. 1871. An act to authorize the Secretary of the Navy to appoint, for supply duty only, officers of the line of the Marine Corps, and for other purposes; to the Committee on Armed Services.

H.R. 1412. An act to grant to the Arthur Alexander Post, No. 68, the American Legion, of Belzoni, Miss., all of the reversionary interest reserved to the United States in lands conveyed to said post pursuant to act of Congress approved June 29, 1938;

H.R. 1874. An act to amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads, and for other purposes," approved July 11, 1916, as amended and supplemented, and for other purposes; and

H.R. 3029. An act to provide for the acquisition of a site and for preparation of plans and specifications for a courthouse to accommodate the United States Court of Appeals for the District of Columbia and the District Court of the United States for the District of Columbia; to the Committee on Public Works.

H.R. 2181. An act relating to institutional on-farm training for veterans; and

H.R. 2368. An act to amend paragraph 8 of part VII, Veterans Regulation No. 1 (a), as amended, to authorize an appropriation of $3,000,000 as a revolving fund in lieu of $1,500,000 now authorized, and for other purposes; to the Committee on Labor and Public Welfare.

H.R. 2353. An act to authorize the patenting of certain public lands to the State of Montana or to the Board of County Commissioners of Hill County, Mont., for public-park purposes; and

H.R. 2678. An act to authorize the Director of the United States Geological Survey to produce and sell copies of aerial or other photographs and mosaics, and photographic or photostatic reproductions of records, on a reimbursement of appropriations basis; to the Committee on Public Lands.

LABOR LEGISLATION—ADDRESS BY SENATOR BALL

[Mr. BALL asked and obtained leave to have printed in the RECORD a radio address on the subject of labor legislation delivered by him on May 12, 1947, which appears in the Appendix.]

THE PLACE OF THE UNITED STATES IN INTERNATIONAL AFFAIRS—ADDRESS BY SENATOR HATCH

[Mr. HOEY asked and obtained leave to have printed in the RECORD an address on the place of the United States in international relations, delivered by Senator HATCH, at the University of North Carolina, May 8, 1947, under the auspices of the International Relations Club of the University, which appears in the Appendix.]

PROHIBITION OF ALCOHOLIC-BEVERAGE ADVERTISEMENTS—STATEMENT OF DR. CLINTON N. HOWARD

[Mr. CAPPER asked and obtained leave to have printed in the RECORD a statement relative to Senate bill 265, prohibiting the transportation in interstate commerce of advertisements of alcoholic beverages, made by Dr. Clinton N. Howard before the Committee on Interstate and Foreign Commerce on May 13, 1947, which appears in the Appendix.]

UNIVERSAL MILITARY TRAINING—EDITORIAL FROM THE CHICAGO HERALD-AMERICAN

[Mr. BREWSTER asked and obtained leave to have printed in the RECORD an editorial entitled "For the Sake of Peace and Safety," published in the Chicago Herald-American of May 5, 1947, which appears in the Appendix.]

IS CONGRESS ANTILABOR?—EDITORIAL FROM MAGAZINE AMERICA

[Mr. MYERS asked and obtained leave to have printed in the RECORD an editorial entitled "Is Congress Antilabor?" from the magazine America, for April 19, 1947, which appears in the Appendix.]

THE STATE DEPARTMENT'S BROADCAST TO RUSSIA—ARTICLE FROM THE NEW YORK HERALD TRIBUNE

[Mr. LODGE asked and obtained leave to have printed in the RECORD an article entitled "The Henry Wallace Affair," by John Crosby, published in the New York Herald Tribune of May 9, 1947, which appears in the Appendix.]

### BUREAU OF MINES

The legislative clerk read the nomination of James Boyd, of Colorado, to be Director of the Bureau of Mines.

Mr. TAFT. Mr. President, I ask that the nomination be passed over.

The PRESIDING OFFICER. Without objection, the nomination will be passed over.

Mr. REVERCOMB. Mr. President, I join in the request that the nomination of James Boyd to be Director of the Bureau of Mines be passed over. I do that not for any personal reason whatsoever, but solely on the ground of doubt as to whether this nominee is fitted for the position and whether he has had the training and experience to fill the position.

The position of Director of Mines is becoming an increasingly important one. More and more he is a director of safety in the mines of this country.

At this session we passed a law with respect to continuing mine inspection in the Bureau of Mines. That law did not contain all that I wanted it to contain, but it indicates that there is a continued interest by the Federal Bureau of Mines in mine inspection. There are approximately 820,000 miners in the Nation, and of that number approximately 400,000 are engaged in coal mining. The preservation of safety has become one of the foremost duties of the Bureau of Mines. I find that Mr. Boyd is absolutely devoid of any experience in the coal-mining industry.

I want to read two questions which he very frankly and fairly answered when he was before the committee. This question was asked by the Senator from Montana [Mr. MURRAY]:

Senator MURRAY. Mr. Boyd, what study have you given to the coal-mining industry?

Mr. BOYD. Senator, I have never worked in the coal-mining industry directly. I have, as a member of the faculty of the Colorado School of Mines, been instrumental in training men who have gone into the coal-mining industry. I have been on inspection trips myself to various coal mines in the West. As I have said, we had direction of coal operations in Europe, and I know something of the operations there. I have never myself been engaged in the coal-mining industry.

And then this question was asked by the Senator from Montana:

Senator MURRAY. You admit that you are not familiar with the conditions in the coal mines in the country, especially here in the eastern section of the country.

Mr. BOYD. Senator, I admit that I have never been employed in coal mines. I have studied the situation for many years, and I know the basic problems in the coal-mining industry.

Mr. President, in view of the fact that more than half of the miners in this country are engaged in the mining of coal, and in view of the fact that the safety of those miners has become the primary duty and interest of the Federal Bureau of Mines, I feel that it is entirely fair to raise the question of the training and competency of Mr. Boyd to fill this position; and I join in the request that the nomination go over.

The PRESIDING OFFICER. The nomination will be passed over.

The clerk will state the next nomination on the calendar.

### NATIONAL LABOR RELATIONS BOARD

The legislative clerk proceeded to read the nominations of two members and the general counsel of the National Labor Relations Board.

Mr. TAFT. Mr. President, I ask that the Labor Relations Board nominations go over.

The PRESIDING OFFICER. Without objection, it is so ordered.

### UNITED STATES PUBLIC HEALTH SERVICE

The legislative clerk proceeded to read sundry nominations in the United States Public Health Service.

Mr. TAFT. Mr. President, I ask that the nominations in the Public Health Service be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

### THE ARMY

The legislative clerk proceeded to read sundry nominations in the Army.

Mr. TAFT. Mr. President, I ask that the nominations in the Army be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

Mr. TAFT. The Senator from South Dakota [Mr. GURNEY] has additional nominations.

Mr. GURNEY. Mr. President, I submit the nominations of 120 captains, 307 first lieutenants, 128 lieutenant colonels, and also certain nominations in the Navy, and ask that they be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

### POSTMASTERS

The legislative clerk proceeded to read sundry nominations of postmasters.

Mr. TAFT. Mr. President, I ask that the postmaster nominations be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the postmaster nominations are confirmed en bloc.

Mr. TAFT. I ask that the President be notified of the confirmations in all of these instances.

The PRESIDING OFFICER. Without objection, the President will be notified forthwith.

### CONDITIONAL ADJOURNMENT JANUARY 2, 1948

Mr. TAFT. Mr. President, in accordance with the terms of Senate Concurrent Resolution 33, adopted earlier today, I move that the Senate do now adjourn.

The motion was agreed to; and (at 8 o'clock and 50 minutes a. m., Sunday, July 27, 1947) the Senate adjourned, the adjournment being, under the provision of Senate Concurrent Resolution 33, to January 2, 1948, at 12 o'clock meridian.

### NOMINATIONS

Executive nominations received by the Senate July 26 (legislative day of July 16), 1947:

#### SECRETARY OF DEFENSE

James V. Forrestal, of New York, to be Secretary of Defense.

#### COLLECTOR OF INTERNAL REVENUE

John T. Jarecki, of Chicago, Ill., to be collector of internal revenue for the first district of Illinois, in place of Nigel D. Campbell, resigned.

### CONFIRMATIONS

Executive nominations confirmed by the Senate July 26 (legislative day of July 16), 1947:

#### SECRETARY OF DEFENSE

James V. Forrestal, to be Secretary of Defense.

#### DEPARTMENT OF JUSTICE

Phillip B. Perlman, to be Solicitor General of the United States.

#### DIPLOMATIC AND FOREIGN SERVICE

TO BE ENVOY EXTRAORDINARY AND MINISTER PLENIPOTENTIARY OF THE UNITED STATES OF AMERICA TO RUMANIA

Rudolf E. Schoenfeld

TO BE FOREIGN SERVICE OFFICERS OF CLASS 0, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

John A. Bovey, Jr.  James R. Ruchti
Ernest E. Ramsaur, Jr.  Ralph S. Saul
Miss Louise Schaffner  Robert M. Winfree
Richard W. Sterling  Robert W. Zimmermann

TO BE FOREIGN SERVICE OFFICERS OF CLASS 5, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Charles F. Baldwin
John Lemmey Stewart
Ben H. Thibodeaux

TO BE FOREIGN SERVICE OFFICERS OF CLASS 5, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Ralph B. Curren  Oscar E. Haskin
Jerome T. Gaspard  Phillip W. Ireland

TO BE FOREIGN SERVICE OFFICERS OF CLASS 4, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Turner C. Cameron, Jr.  Eric Kocher
Harry Conover  William Henry Lawrence
Robert C. Creel  Frank G. Biscoe
Ridgway B. Knight

TO BE A FOREIGN SERVICE OFFICER OF CLASS 5, A VICE CONSUL OF CAREER, AND SECRETARY IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

James R. Gantin.

TO BE FOREIGN SERVICE OFFICERS OF CLASS 6, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Robert A. Aylward  Francis N. Magliozzi
Howard L. Boorman  Parke D. Massey, Jr.
William D. Brewer  Everett K. Melby
Edward West Burgess  Alfred E. Moon
Stephen A. Cominsky  Curtis W. Prendergast
William B. Dunn  Herbert F. Propps
Seymour M. Finger  Lowell C. Richardson
Walter P. Houk  Jordan T. Rogers
Vernon V. Hukes  Howard Rand Stephenson
Joseph E. Jacques
Robert L. James  Kenneth F. T. Sullivan
Edward J. Krache, Jr.  Edward J. Trost
Edward T. Long  Wayland B. Waters

App. 48

95
Case 1:08-cr-00055-RLV-DCK   Document 127-13   Filed 10/30/09   Page 4 of 10

of those which duplicate or conflict with each other or with activities carried on by the Government of Puerto Rico. He shall report through the Secretary of the Interior to the President and to Congress concerning the administration of all Federal civilian functions and activities in Puerto Rico, specifying the recommendations made by him to the Federal agencies and the results of such recommendations. He shall advise the Secretary of the Interior, who shall advise the Bureau of the Budget and the Congress with respect to all appropriation estimates submitted by any civilian department or agency of the Federal Government to be expended in or for the benefit of Puerto Rico. He shall confer with the Governor of Puerto Rico with respect to the correlation of activities of Federal and insular agencies and all plans and programs and other matters of mutual interest.

"'(3) The President of the United States may, from time to time, after hearing, promulgate Executive orders expressly excepting Puerto Rico from the application of any Federal law, not expressly declared by Congress to be applicable to Puerto Rico, which as contemplated by section 9 of this act is inapplicable by reason of local conditions. The Coordinator of Federal Agencies may, from time to time, make recommendations to the President for such purposes. Any such recommendation shall show the concurrence or dissent of the Governor of Puerto Rico.

"'(4) The Coordinator of Federal Agencies, in the name of the President of the United States, shall have authority to request from the Governor of Puerto Rico, and the Governor shall furnish to him all such reports pertaining to the affairs, conditions, and government of Puerto Rico as the Coordinator of Federal Agencies shall from time to time request for transmission to the President through the Secretary of the Interior.

"'(5) The President of the United States shall prescribe such rules and regulations as may be necessary to carry out the provisions of this section.'

"Sec. 7. Section 2 of said Organic Act (48 U. S. C., sec. 737) is amended by adding at the end thereof the following new paragraph:

"'The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States.'"

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

The Senate amendments were concurred in.

A motion to reconsider was laid on the table.

RECESS

The SPEAKER. The Chair declares the House in recess at this time subject to the call of the Chair.

Accordingly (at 12 o'clock and 10 minutes a. m.), the House stood in recess, subject to the call of the Chair.

AFTER RECESS

The recess having expired, the House was called to order by the Speaker at 12 o'clock and 31 minutes a. m.

FURTHER MESSAGE FROM SENATE

A further message from the Senate, by Mr. Carrell, one of its clerks, announced that the Senate agrees to the amendment of the House to a concurrent resolution of the Senate of the following title:

S. Con. Res. 33. Concurrent resolution providing for the adjournment of the two Houses of Congress until January 2, 1948.

SENATE ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED

The SPEAKER announced his signature to enrolled bills and joint resolutions of the Senate of the following titles:

S. 609. An act conferring jurisdiction upon the United States District Court for the Western District of Arkansas to hear, determine, and render judgment upon any claims arising out of the deaths of Norman Ray Pedron and Carl Franklin Morris;

S. 758. An act to promote the national security by providing for a Secretary of Defense; for a National Military Establishment; for a Department of the Army, a Department of the Navy, and a Department of the Air Force; and for the coordination of the activities of the National Military Establishment with other departments of the Government concerned with the national security;

S. 794. An act to authorize the sale of a small tract of land on the Cherokee Indian Reservation, N. C.;

S. 892. An act for the payment of claims of one Fidelity Trust Co., of Baltimore, Md., and others, covered by findings of fact made by the United States Court of Claims, dated June 5, 1944, and contained in Senate Document No. 229, Seventy-eighth Congress, second session;

S. 907. An act to provide for the orderly transaction of the public business in the event of the death, resignation, or separation from office of regional disbursing officers of the Treasury Department;

S. 1070. An act to provide for the cancellation of the capital stock of the Federal Deposit Insurance Corporation and the refund of moneys received for such stock, and for other purposes;

S. 1181. An act for the relief of Robert F. Parks;

S. 1350. An act to authorize relief of accountable officers of the Government, and for other purposes;

S. 1361. An act to amend the United States Housing Act of 1937 so as to permit loans, capital grants, or annual contributions for low-rent housing and slum-clearance projects where construction costs exceed present cost limitations upon condition that local housing agencies pay the difference between cost limitations and the actual construction costs;

S. 1463. An act to amend section 12 of the Immigration Act of 1917;

S. 1480. An act authorizing the conveyance to the State of Delaware of a portion of Pea Patch Island;

S. 1494. An act to amend section 14 of the Veterans' Preference Act of June 27, 1944;

S. 1505. An act authorizing the Secretary of Agriculture to convey certain lands in Boise, Idaho, to the Boise Chamber of Commerce;

S. 1582. An act relating to the sale of Paxon Field, Duval County, Fla.;

S. 1690. An act to amend the District of Columbia rent-control law so as to provide that schools and universities may recover possession of housing accommodations in certain cases;

S. 1633. An act to authorize the attendance of the Marine Band at the National Convention of the American Legion to be held in New York, N. Y., August 28 to 31, 1947, and the National Convention of the Veterans of Foreign Wars of the United States to be held in Cleveland, Ohio, September 4 to 9, 1947;

S. 1661. An act to provide additional inducements to physicians, surgeons, and dentists to make a career of the United States military, naval, and public-health services, and for other purposes;

S. J. Res. 112. Joint resolution to establish a commission to formulate plans for the erection, in Grant Park, Chicago, Ill., of a Marine Corps memorial;

S. J. Res. 130. Joint resolution relating to safety in bituminous-coal and lignite mines of the United States;

S. J. Res. 138. Joint resolution to provide for return of Italian property in the United States, and for other purposes; and

S. J. Res. 148. Joint resolution to authorize the temporary continuation of regulation of consumer credit.

ADJOURNMENT

Mr. HALLECK. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 12 o'clock and 32 minutes a. m.), pursuant to Senate Concurrent Resolution 33, the House adjourned until Friday, January 2, 1948, at 12 o'clock noon.

EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

993. A letter from the Attorney General, transmitting request for withdrawal of the case of Juan Hernandez Ayala from those 130 cases involving suspension of deportation referred to in letter of June 16, 1947; to the Committee on the Judiciary.

994. A letter from the Clerk, House of Representatives, transmitting the motion to dismiss of the contestee in the contested election case of Lawrence Michael against Howard W. Smith for a seat in the House of Representatives from the Eighth Congressional District of the State of Virginia (H. Doc. No. 418); to the Committee on House Administration and ordered to be printed.

995. A letter from the Executive Secretary, Air Coordinating Committee, transmitting a draft of a proposed bill to encourage the development of a safe United States flag international air transportation system properly adapted to the present and future needs of foreign commerce of the United States, of the postal service, and of the national defense, and to meet certain of the obligations incumbent upon the United States by virtue of its membership in the International Civil Aviation Organization, by providing for the transfer, establishment, operation, administration, and maintenance of airport and airway property located outside the continental United States, for the training of foreign nationals in aviation activities, and for other purposes; to the Committee on Interstate and Foreign Commerce.

996. A letter from the Acting Secretary of Commerce, transmitting a draft of a proposed bill to provide basic authority for the performance of certain functions and activities of the Department of Commerce, and for other purposes; to the Committee on Interstate and Foreign Commerce.

997. A letter from the Acting Secretary of Commerce, transmitting a draft of a proposed bill to provide basic authority for certain functions and activities of the Weather Bureau, and for other purposes; to the Committee on Interstate and Foreign Commerce.

998. A letter from the Secretary of the Interior, transmitting interim report on the status of investigations of potential water resource developments in the Colorado River Basin in Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming (H. Doc. No. 419); to the Committee on Public Lands and ordered to be printed, with illustrations.

Case 1:08-cr-00055-RLV-DCK   Document 127-13   Filed 10/30/09   Page 5 of 10

be established by legislation now pending in the Congress (with an accompanying paper); to the Committee on Appropriations and ordered to be printed.

SUPPLEMENTAL ESTIMATE, FEDERAL WORKS AGENCY (S. Doc. No. 176)

A communication from the President of the United States, transmitting a supplemental estimate of appropriation for the Federal Works Agency, amounting to $15,000,000, fiscal year 1949, and a proposed contract authorization in the amount of $19,000,000 (with an accompanying paper); to the Committee on Appropriations and ordered to be printed.

SUPPLEMENTAL ESTIMATE, SEVERAL EXECUTIVE DEPARTMENTS AND INDEPENDENT OFFICES (S. Doc. No. 177)

A communication from the President of the United States, transmitting an estimate of appropriation for the several executive departments and independent offices to pay claims for damages, audited claims, and judgments rendered, against the United States, as provided by various laws, in the amount of $2,303,458.55, together with an indefinite amount as may be necessary to pay interest and costs (with accompanying papers); to the Committee on Appropriations and ordered to be printed.

PETITIONS AND MEMORIALS

Petitions, etc., were laid before the Senate and referred as indicated:

By the PRESIDENT pro tempore:

A letter in the nature of a petition from Laura B. Prisk, of New York, N. Y., relating to Flag Day; to the Committee on the Judiciary.

A telegram in the nature of a petition from Walter L. M. Hodge, chairman, Municipal Committee, St. Croix, V. I., praying for the enactment of House bill 5904, to incorporate the Virgin Islands Corporation; ordered to lie on the table.

A resolution adopted by the forty-second annual convention of the Maryland State and District of Columbia Federation of Labor, at Washington, D. C., protesting against the enactment of the Mundt-Nixon un-American activities bill; to the Committee on the Judiciary.

A memorial of sundry citizens of the State of Washington, remonstrating against the enactment of the so-called Mundt-Nixon un-American activities bill; to the Committee on the Judiciary.

REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. BUTLER, from the Committee on Interior and Insular Affairs:

S. 2080. A bill to provide for the establishment of the Philadelphia National Historical Park, and for other purposes; with amendments (Rept. No. 1622); and

H. R. 6090. A bill authorizing the Secretary of the Interior to issue patents for lands held under color of title; without amendment (Rept. No. 1618).

By Mr. WILEY, from the Committee on the Judiciary:

H. R. 3190. A bill to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure;" with amendments (Rept. No. 1620); and

H. R. 6112. A bill to codify and enact into law title 3 of the United States Code, entitled "The President"; without amendment (Rept. No. 1623).

By Mr. COOPER, from the Committee on the Judiciary:

S. 1764. A bill to amend the Trading With the Enemy Act; without amendment (Rept. No. 1619).

By Mr. SALTONSTALL, from the Committee on Appropriations:

H. R. 6772. A bill making appropriations for the Department of the Navy and the naval service for the fiscal year ending June 30, 1949, and for other purposes; with amendments (Rept. No. 1621).

By Mr. BYRD, from the Committee on Armed Services:

S. 2098. A bill to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institute, a State institution; with amendments (Rept. No. 1624).

PROTECTION AGAINST LYNCHING—REPORT OF A COMMITTEE

Mr. FERGUSON. Mr. President, from the Committee on the Judiciary, I ask unanimous consent to report an original bill, to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, and I submit a report (No. 1625) thereon. The report is short, and I request that it be printed in the RECORD.

The PRESIDENT pro tempore. Without objection, the bill and the report will be received, and the bill will be placed on the calendar; and, without objection, the report will be printed in the RECORD.

The bill (S. 2860) to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, was received, read twice by its title, and ordered to be placed on the calendar.

The report was ordered to be printed in the RECORD, as follows:

The Committee on the Judiciary, which has had under consideration various bills relating to the protection of persons within the several States from lynching, report favorably a bill to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, with the recommendation that the bill do pass.

The purpose of the bill is self-explanatory in the title statement in that it is designed to provide for the better assurance of the protection of persons from lynching.

STATEMENT

Section 1 of the bill is self-explanatory.

Section 2 of the bill, which contains the definitions, might be considered one of the most important parts of the measure.

The bill defines lynching as an exercise or an attempt to exercise by an assembly of two or more persons, without authority of law, by action of physical force against person or property, of any power of correction or punishment over any persons in the custody of any peace officer, or suspected of, charged with, or convicted of the commission of any criminal offense with the purpose or consequence of preventing the apprehension or trial or punishment by law of such person, or of imposing a punishment. The essence of the offense is the depriving of the person accused or suspected of crime of a trial in the manner provided by law and, if such person is convicted, of punishment in the manner provided by law.

Section 3 of the bill makes it a crime punishable by imprisonment and/or a fine for Federal or State officers to conspire with members of a lynching mob in the prosecution of a lynching. The constitutionality of the imposition of Federal sanctions against Federal or State officers for their participation in a lynching will not be discussed in this section. In a later paragraph it is pointed out that such sanctions are valid. The question here involves the validity of Federal sanctions imposed against members of the lynch mob when they conspire with the Federal or State officers. It seems to be well-settled law that any Federal sanctions against the individual lynchers (aiders, abettors, etc.) are invalid.

It appears well settled that under the fourteenth amendment to the Constitution, Congress does not have the authority to enact sanctions against private individuals or individual actions. (The Civil Rights cases (109 U. S. 3); U. S. v. Harris (106 U. S. 629); Slaughterhouses cases (83 U. S. 36); U. S. v. Cruikshank (92 U. S. 542); Strauder v. West Virginia (100 U. S. 303); Virginia v. Rives (100 U. S. 313); Hodges v. U. S. (203 U. S. 1); Corrigan v. Buckley (271 U. S. 327).)

It is the opinion of this committee that those individuals who conspire with Federal or State officers for the purposes of lynching may be held guilty of the crime or conspiracy when, in effect, they could not be held guilty of lynching. It is sufficient if one of the parties to a conspiracy is legally capable of committing the offense, while the other party may not have that capacity (Chadwick v. U. S. (141 F. 225); Olien v. U. S. (157 F. 061, 85 C. C. A. 113, certiorari denied, 207 U. S. 598)). A person may be guilty of conspiring although incapable of committing the objective offense (Farnsworth v. Zerbst (98 F. 2d 541); U. S. v. Rabinowick (238 U. S. 78, 86); U. S. v. Holte (236 U. S. 140, 144); Jelke v. U. S. (255 F. 265); Israel v. U. S. (3 F. 2d 743); U. S. v. Lyman (190 F. 414); U. S. v. Socony Vacuum Oil Company (310 U. S. 150)).

Section 4 punishes State officers and employees for their failure to prevent a lynching. The fourteenth amendment is directed toward the action of the States, including the action of State officers. Any action by the officers of the State which violates the prohibition upon State action contained in the fourteenth amendment is subject to penalty imposed by the United States (Ex Parte Virginia (100 U. S. 339); Screws v. U. S. (325 U. S. 91)). The right not to be deprived by a State (or State officers) of a trial by the State, or of the punishment prescribed by law, is inherent in due process of law (Screws v. U. S. supra; Crews v. U. S. (160 F. 2d 746); U. S. v. Classic (313 U. S. 299)).

Section 5 of the bill penalizes Federal officers and employees for their willful failure to prevent a lynching. Congress has, many times, created penalties upon Federal officers for a violation of their duties. The creation of the sanction in itself creates a duty on a Federal officer not to commit acts which would invoke the imposition of the penalty. (See the offenses defined and punished in U. S. Code, title 18, secs. 171 et seq.)

Section 6 defines the duty of the Attorney General of the United States under this act. It imposes a duty upon him to cause an investigation to be made to determine whether there has been a violation of the bill, whenever a lynching occurs, and information on oath is submitted to him that any officer or employee of the United States or of a State, or any governmental subdivision thereof, is guilty of a criminal offense under section 4 or section 5 of the bill. This section merely spells out a duty which normally rests with the Attorney General, the chief law enforcement officer of the United States, to enforce, and prosecute violations of, all criminal laws of the United States. It is not intended to restrict the Attorney General in the enforcement of the act but to make it mandatory upon him to cause the investigation prescribed if the information on oath is submitted to him.

Section 7 provides for civil actions for damages by an individual who is lynched (or his next of kin) against any person violating section 3, section 4, or section 5 of the act with respect to that lynching.

The validity of this section rests upon the same constitutional bases and cases cited under the foregoing sections 3, 4, or 5. Obviously, if Congress has the authority to make certain acts a crime, punishable by fines and/or imprisonment, it also has the

Case 1:08-cr-00055-RLV-DCK Document 127-13 Filed 10/30/09 Page 6 of 10
App. 50

ter, east half of the northwest quarter, the east half of the east half of the west half of the northwest quarter, section 17, lots 1, 2, and 3, section 18, township 7 south, range 28 east, Montana principal meridian, containing approximately 628 acres.

The amendments were agreed to.

The bill was ordered to be engrossed for a third reading, read the third time, and passed.

## IMPROVEMENT OF POST OFFICE, LOS ANGELES, CALIF.

The bill (H. R. 5750) to provide for the extension and improvement of post-office facilities at Los Angeles, Calif., and for other purposes, was considered, ordered to a third reading, read the third time, and passed.

## LEASE OF LAFAYETTE BUILDING, WASHINGTON, D. C.

The bill (S. 2706) to authorize the Federal Works Administrator to lease for commercial purposes certain space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building, was considered, ordered to be engrossed for a third reading, read the third time, and passed, as follows:

*Be it enacted, etc.,* That the Federal Works Administrator is hereby authorized to lease for commercial purposes for periods not exceeding 10 years and upon such terms and conditions as he may deem to be in the public interest, such space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building, as was leased by the Reconstruction Finance Corporation for commercial purposes on July 30, 1947, the date title to such building was transferred from the Reconstruction Finance Corporation to the United States of America by section 306, title III, Public Law 268, Eightieth Congress. The rentals received pursuant to this act may be deposited into a common fund account or accounts in the Treasury, and notwithstanding the provisions of the act of June 30, 1932 (40 U. S. C. 303b), shall be available to pay the cost of maintenance, upkeep, and repair of the space so leased and for the establishment of necessary reserves therefor: *Provided*, That except for such necessary reserves, the unobligated balances of rentals so deposited into the Treasury shall be covered at the end of each fiscal year into miscellaneous receipts.

## ISSUANCE OF PATENTS FOR CERTAIN LANDS

The bill (H. R. 6090) authorizing the Secretary of the Interior to issue patents for lands held under color of title was considered, ordered to a third reading, read the third time, and passed.

## REVISION AND CODIFICATION OF TITLE 18, UNITED STATES CODE

The Senate proceeded to consider the bill (H. R. 3190) to revise, codify, and enact into positive law title 18 of the United States Code, entitled "Crimes and Criminal Procedure," which had been reported from the Committee on the Judiciary with amendments.

The PRESIDENT pro tempore. Is there objection to present consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

The PRESIDENT pro tempore. The bill contains a large volume of amendments. Is there objection to the consideration of the amendments en bloc?

Mr. TAFT. Mr. President, may we have an explanation of the bill? This is a long bill, containing 475 pages.

Mr. WILEY. Mr. President, I assure the distinguished Senator I shall not take much time, and that we shall not spend much time on the bill.

The House has sent to the Senate the revision of title 18. It was my privilege and duty to appoint a very distinguished subcommittee to go over the matter. The subcommittee was headed by the Senator from Missouri [Mr. DONNELL].

The purpose of the bill is to codify and revise the laws relating to Federal crimes and criminal procedure.

With the amendments proposed by the committee the bill includes all pertinent laws to January 5, 1948, and is made effective September 1, 1948.

The bill makes it easy to find the criminal statutes because of the arrangement, numbering, and classification. The original intent of Congress is preserved. A uniform style of statutory expression is adopted. The new Federal Rules of Criminal Procedure are keyed to the bill and are reflected in part II of title 18.

Obsolete and executed provisions are eliminated. Uncertainty will be ended and there will no longer be any need to examine the many volumes of the Statutes at Large as the bill, upon enactment, will itself embody the substantive law which will thus appear in full in the United States Code.

It is one of the constructive things we have been endeavoring to accomplish, and I think the bill accomplishes it. I should like to see the amendments adopted en bloc. If any further specific information is desired, I shall ask the distinguished senior Senator from Missouri to explain it, but I think, in view of the fact that the work has been gone into by some of the best experts in codification in America, in conjunction with the House committee, the committee has proposed a number of amendments, most of which are insubstantial, some of which are substantial. They will necessitate, I assume, if we pass the bill, a conference with the House. I hope the measure can be disposed of without a great deal of debate. As I said, it is along the line of bringing together the Federal criminal statutes into one place, so as to avoid the necessity of going from one volume to another in order to ascertain what the criminal law of the Nation is.

The PRESIDENT pro tempore. The Senator's time has expired. Is there objection to the consideration of the amendments en bloc?

There being no objection, the amendments were considered and agreed to en bloc.

The amendments agreed to en bloc are as follows:

Page 3, following "13. Laws of States adopted for areas within Federal jurisdiction." Insert: "14. Applicability to Canal Zone."

Page 5, line 4, after "States" insert: ", except the Canal Zone."

Page 8, after line 15, insert:

"§ 14. Applicability to Canal Zone.

"In addition to the sections of this title which by their terms apply to and within the Canal Zone, the following sections of this title shall likewise apply to and within the Canal Zone: 6, 8, 11, 331, 371, 472, 474, 478, 479, 480, 481, 482, 483, 485, 486, 489, 490, 499, 502, 506, 594, 595, 598, 600, 601, 604, 605, 608, 611, 612, 703, 756, 791, 792, 793, 794, 795, 796, 797, 915, 917, 951, 953, 954, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965, 966, 967, 1017, 1073, 1301, 1364, 1383, 1542, 1543, 1544, 1546, 1584, 1621, 1622, 1761, 1821, 1914, 2151, 2152, 2153, 2154, 2155, 2156, 2199, 2231, 2234, 2235, 2274, 2275, 2277, 2384, 2385, 2388, 2389, 2390, 2421, 2422, 2423, 2424, 3059, 3105, 3109."

Page 91, strike out "610. Contributions by national banks or corporations." and insert: "610. Contributions or expenditures by national banks, corporations, or labor organizations."

Page 104, strike out lines 4 to 21, inclusive, and insert:

"§ 610. Contributions by national banks, corporations, or labor organizations.

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, in violation of this section shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

"For the purposes of this section 'Labor organizaiton' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Page 117, line 8, strike out all after "receiver," down to and including "System," in line 15.

Page 118, line 18, strike out all after "care," down to and including "institution," in line 23.

Page 134, line 19, after "both" insert:"; or if he negligently suffers such person to escape, he shall be fined not more than $500 or imprisoned not more than 1 year, or both."

Page 156, after line 12, insert: "While any foreign government is a member both of the International Monetary Fund and of the International Bank for Reconstruction and Development, this section shall not apply to the sale or purchase of bonds, securities, or other obligations of such government or any political subdivision thereof or of any organization or association acting for or on behalf of such government or political subdivision, or to making of any loan to such government, political subdivision, organization, or association."

Page 367, strike out lines 15 to 18, inclusive, and insert: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

Page 415, line 10, after "Zone," insert "District of Columbia."

Page 415, after line 17, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 416, after line 21, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 448, lines 24 and 25, strike out "the Revised Statutes (1 U. S. C., sec. 1)" and insert: "Title 1 of the United States Code."

Page 456, strike out lines 3 to 21, inclusive.

Page 456, line 22, strike out "19" and insert "18."

Page 457, line 3, strike out "20" and insert "19."

Page 457, strike out lines 8 to 15, inclusive, and insert:

"SEC. 20. This act shall take effect September 1, 1948."

Page 457, line 16, strike out "22" and insert "21."

Page 463, about middle of page, strike out:

"July 3........|128| 4, 5| 40|755, 756| 16|     705, 706"

Page 467, below middle of page, strike out:

"June 20......| 634|    4| 49| 1556| 16|     705
Do.....| 635| 1, 2| 49| 1557| 22|     248"

And insert:

"June 20......| 635| 1, 2| 49| 1557| 22|     248"

Page 470, after

"June 8.......|178| 1, 2, 3| 59|234, 235| 18| 241, 241a, 242"

insert:

"July 31......| 339|   9| 50| 51|6 31|     804b"

Page 471, at the end of the schedule of repeals on this page, insert:

"1947—
Apr. 16.| 39|......| 01| 52| 18|     411
May 10.| 73|......| 61| 97| 18|     744b-1
June 21.| 111|......| 61| 134| 18|     244
June 23.| 120|  304| 01| 159|  2|     261"

The amendments were ordered to be engrossed and the bill to be read a third time.

The bill was read the third time and passed.

Mr. WILEY. Mr. President, I move that the Senate insist upon its amendments, request a conference with the House thereon, and that the Chair appoint the conferees on the part of the Senate.

The motion was agreed to.

The PRESIDENT pro tempore. The Chair will presently name the conferees.

Mr. WILEY subsequently said: Mr. President, I have been credibly informed that the House will accept our amendments. In view of that information, I ask that the action taken to rescind on my motion to appoint conferees in respect to the bill (H. R. 3190) be rescinded.

The PRESIDENT pro tempore. Without objection, it is so ordered.

AMENDMENT OF TRADING WITH THE ENEMY ACT

The bill (S. 2764) to amend the Trading With the Enemy Act was announced as next in order.

The PRESIDENT pro tempore. Is there objection to the present consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

Mr. COOPER. Mr. President, I offer an amendment.

Mr. PEPPER. I should like an explanation of the bill.

The PRESIDENT pro tempore. The Senator from Kentucky offers an amendment which the clerk will state.

The CHIEF CLERK. On page 3, line 14, after the word "buy", it is proposed to strike out "July 31, 1949", and insert "April 30, 1949."

The PRESIDENT pro tempore. The question is on agreeing to the amendment submitted by the Senator from Kentucky.

Mr. PEPPER. Mr. President, I request an explanation of the bill.

Mr. COOPER. Mr. President, the bill proposes to amend section 32 of the Trading With the Enemy Act. That section, among other things, authorizes the Alien Property Custodian to return property to an alien if he deems that the alien was a persecutee. It has developed that some of these persons to whom property would be returned are dead, and there are no known heirs. In such case I assume the property would escheat to this country.

The bill provides that the President may designate approved organizations under certain limitations and conditions, and that such organizations may receive the property of a deceased persecutee alien and use it for the benefit of the group to which the persecutee belonged. I think it is a very humane measure. It was introduced by the Senator from Ohio [Mr. TAFT].

The PRESIDENT pro tempore. The question is on agreeing to the amendment offered by the Senator from Kentucky.

The amendment was agreed to.

The bill was ordered to be engrossed for a third reading, read the third time, and passed, as follows:

Be it enacted, etc., That section 32 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, is hereby further amended by adding at the end thereof the following subsection:

"(h) The President may designate one or more organizations as successors in interest to deceased persons, who, if alive, would be eligible to receive returns under the provisos of subdivision (C) or (D) of subsection (a) (2) hereof. An organization so designated shall be deemed a successor in interest by operation of law for the purposes of subsection (a) (1) hereof. Return may be made to an organization so designated (a) prior to July 31, 1949, or 2 years from the vesting of the property or interest in question, whichever is later, if the President or such officer or agency as he may designate determines from all relevant facts of which he is then advised that it is probable that the former owner is dead and is survived by no person eligible under section 32 to claim as successor in interest by inheritance, devise, or bequest; and (b) after such later date, if no claim for the return of the property or interest is pending.

"No return may be made to an organization so designated unless it files a claim on or before January 1, 1952, and unless it gives assurances satisfactory to the President that (i) it will use the property or interest returned to it for the rehabilitation and resettlement of persons who suffered substantial deprivation of liberty or failed to enjoy the full rights of citizenship within the meaning of subdivisions (C) and (D) of subsection (a) (2) hereof, by reason of their membership in the political, racial, or religious group of which the former owner was a member; (ii) it will transfer, at any time within 2 years from the time that return is made, such property or interest or the equivalent value thereof to any person designated as entitled thereto pursuant to this act by the President or such officer or agency; and (iii) it will make such reports and permit such examination of its books as the President or such officer or agency may from time to time require.

"The filing of a claim by an organization so designated shall not bar the payment of debt claims under section 34 of this act."

SEC. 2. The first sentence of section 33 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, is hereby further amended to read as follows:

"SEC. 33. No return may be made pursuant to section 9 or 32 unless notice of claim has been filed, (a) in the case of any property or interest acquired by the United States prior to December 18, 1941, by August 9, 1948, or (b) in the case of any property or interest acquired by the United States on or after December 18, 1941, by April 30, 1949, or 2 years from the vesting of the property or interest in respect of which the claim is made, whichever is later: Provided, That return may be made to successor organizations designated pursuant to section 32 (h) hereof if notice of claim is filed by January 1, 1952."

PHILADELPHIA NATIONAL HISTORICAL PARK

The bill (S. 2080) to provide for the establishment of the Philadelphia National Historical Park, and for other purposes, was announced as next in order.

The PRESIDENT pro tempore. This bill is identical with Calendar No. 1764, House bill 5053.

Mr. BUTLER. Mr. President, I ask that the House bill be substituted for Senate bill S. 2080, and that the Senate proceed to the consideration of the House bill.

The PRESIDENT pro tempore. Is there objection to the substitution of the House bill for the Senate bill and its present consideration?

There being no objection, the bill (H. R. 5053) to provide for the establishment of the Independence National Historical Park, and for other purposes, was considered, ordered to a third reading, read the third time, and passed.

The PRESIDENT pro tempore. Without objection, Senate bill 2080 is indefinitely postponed.

CODIFICATION OF TITLE 3 OF THE UNITED STATES CODE

The bill (H. R. 6412) to codify and enact into law title 3 of the United States Code, entitled "The President," was considered, ordered to a third reading, read the third time, and passed.

TRANSFER OF CERTAIN ARMY EQUIPMENT TO NEW MEXICO MILITARY INSTITUTE

The Senate proceeded to consider the bill (S. 2698) to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institute, a State institution, which had been reported from the Committee on Armed Services, with amendments, on page 1, line 4, after the word "authorized", to insert "upon the request of the institution"; in line 7, after the word "institution", to insert "to Cornell University, Ithaca, N. Y., to Norwich University, Norwich, Vt., and to Virginia Military Institute, Lexington, Va."; on page 2, line 1, before the word

Case 1:08-cr-00055-RLV-DCK  Document 127-13  Filed 10/30/09  Page 8 of 10

BROOKS] may be excused as a conferee on the bill, S. 2655.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

The SPEAKER. The Chair appoints the gentleman from North Carolina [Mr. DURHAM] to fill the vacancy.

The Clerk will notify the Senate of the action of the House.

## PROVIDING FOR WATER POLLUTION CONTROL ACTIVITIES

Mr. DONDERO. Mr. Speaker, I call up the conference report on the bill (S. 418) to provide for water pollution control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes, and ask unanimous consent that the statement of the managers on the part of the House be read in lieu of the report.

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

The Clerk read the statement.

The conference report and statement are as follows:

### CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 418) "An Act to provide for water pollution control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes", having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House, and agree to the same with amendments, as follows:

Page 2, line 12, of the amendment of the House, strike out the words "hereinafter declared to be a public nuisance".

Page 2, lines 13 and 14, of the amendment of the House, strike out the words "such interstate water and tributaries thereof", and insert the following words "surface and underground waters".

Page 9, line 11, of the amendment of the House, strike out the figure "$200,000" and insert the figure "$250,000".

Page 11, line 25, of the amendment of the House, strike out the figure "$20,000,000" and insert the figure "$22,500,000".

Page 12, line 25 of the amendment of the House, after the words "study of" insert the word "water", and strike out the word "of" after the word "pollution".

Page 13, line 1, of the amendment of the House, strike out the words "interstate waters".

Page 13, line 2, of the amendment of the House, before the word "pollution" insert the word "water", and after the word "pollution" strike out the words "of interstate waters".

Page 14, line 17 through line 23, of the amendment of the House, strike out all after the words "SEC. 9. (a)" and insert the following: "Five officers may be appointed to grades in the Regular Corps of the Public Health Service above that of senior assistant, but not to a grade above that of director, to assist in carrying out the purposes of this Act. Officers appointed pursuant to this subsection in any fiscal year shall not be counted as part of the 10 per centum of the original appointments authorized to be made in such year under section 207 (b) of the Public Health Service Act; but they shall for all other purposes be treated as though appointed pursuant to such section 207 (b)."

And the House agrees to the same.

GEO. A. DONDERO,
J. HARRY MCGREGOR,
PAUL CUNNINGHAM,
JAMES C. AUCHINCLOSS,
WILL M. WHITTINGTON,
JOHN A. BLATNIK,
TOM PICKETT,
*Managers on the Part of the House.*

GEO. W. MALONE,
CHAPMAN REVERCOMB,
JOHN L. MCCLELLAN,
*Managers on the Part of the Senate.*

### STATEMENT

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 418) submit the following statement in explanation of the effect of the action agreed upon and recommended in the accompanying conference report as to each of such amendments, namely:

The first two amendments apply to Sec. 2 (a), lines 4, 5, and 6, on page 18 of the bill. The language substituted more clearly defines the authority of the Surgeon General with respect to the preparation and adoption of comprehensive programs for eliminating or reducing the pollution of surface and underground waters.

The amendment to Sec. 5 (line 3, page 25), increases by $50,000 the maximum individual loan which may be made under the Act.

The amendment to Sec. 7 (line 16, page 27), increases by $2,500,000 the maximum authorized to be appropriated to the Federal Security Agency for each of the five fiscal years during the period beginning July 1, 1948, and ending June 30, 1953, for the purpose of making loans under Section 5 of the Act.

The purpose of the amendments to Sec. 8 (b) (lines 16, 17, and 18, page 28), is to expand the service of the Public Health Service station authorized to be erected at Cincinnati, Ohio, in connection with research and study of water pollution and the training of personnel in work related to control of water pollution.

The amendment with reference to Sec. 9 (a), (lines 10 to 16, page 30), substitutes a new Sec. 9 (a), which is required for the purpose set forth in the following letter:

FEDERAL SECURITY AGENCY,
*Washington, Zone 25, May 14, 1948.*

DEAR MR. CHAIRMAN: This is in reference to S. 418, which your Committee reported out, with amendments, on April 28, 1948.

Section 9 (a) of S. 418 as reported authorizes additional appointments to be made at higher grades in the Regular Corps of the Public Health Service pursuant to section 208 (b) of the Public Health Service Act to assist the Service in carrying out its new or expanded activities under S. 418. Since our letter of January 19, 1948, to you on this bill, however, the Congress has enacted Public Law 425, which amends the provisions of the Public Health Service Act in several respects, primarily in the matter of appointment and promotion of commissioned officers of the Public Health Service. As a result of Public Law 425, the authority to make additional appointments at higher grades in the Regular Corps of the Public Health Service, formerly contained in section 208 (b) of the Public Health Service Act, is now contained in section 207 (b) of that Act, in a somewhat revised form. In order, therefore, to accomplish the purposes for which section 9 (a) of S. 418 was intended, the following is suggested in lieu of such section 9 (a):

"(a) Five officers may be appointed to grades in the Regular Corps of the Service above that of senior assistant, but not to a grade above that of director, to assist in carrying out the purposes of this Act. Officers appointed pursuant to this subsection in any fiscal year shall not be counted as part of the 10 per centum of the original appointments authorized to be made in such year under section 207 (b) of the Public Health Service Act; but they shall for all other purposes be treated as though appointed pursuant to such section 207 (b).

The short time available for necessary action on the amendment suggested by this letter has not permitted us to obtain advice from the Bureau of the Budget as to the relationship of this amendment to the program of the President.

Sincerely yours,
J. DONALD KINGSLEY,
*Acting Administrator.*

Hon. GEORGE A. DONDERO,
*Chairman, Committee on Public Works, House of Representatives, Washington 25, D. C.*

GEO. A. DONDERO,
J. HARRY MCGREGOR,
JAMES C. AUCHINCLOSS,
PAUL CUNNINGHAM,
WILL M. WHITTINGTON,
JOHN A. BLATNIK,
TOM PICKETT,
*Managers on the Part of the House.*

The conference report was agreed to.

A motion to reconsider was laid on the table.

## UNITED STATES CODE, TITLE 18

Mr. REED of Illinois. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure," with Senate amendments thereto, and concur in the Senate amendments.

The Clerk read the title of the bill.

The Clerk read the Senate amendments, as follows:

Page 3, following:
"13. Laws of States adopted for areas within Federal jurisdiction."
Insert:
"14. Applicability to Canal Zone."

Page 5, line 4, after "States" insert ", except the Canal Zone."

Page 8, after line 15, insert:
"§ 14. Applicability to Canal Zone."

"In addition to the sections of this title which by their terms apply to and within the Canal Zone, the following sections of this title shall likewise apply to and within the Canal Zone: 6, 8, 11, 331, 371, 472, 474, 478, 479, 480, 481, 482, 483, 485, 488, 489, 490, 499, 502, 500, 594, 595, 598, 600, 601, 604, 605, 608, 611, 612, 703, 756, 791, 792, 793, 794, 795, 796, 797, 915, 917, 951, 953, 954, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965, 966, 967, 1017, 1073, 1301, 1364, 1382, 1542, 1543, 1544, 1546, 1664, 1621, 1622, 1761, 1821, 1914, 2151, 2152, 2153, 2154, 2155, 2156, 2190, 2231, 2234, 2235, 2274, 2275, 2277, 2384, 2385, 2386, 2388, 2390, 2421, 2422, 2423, 2424, 3059, 3105, 3109."

Page 91, strike out
"610. Contributions by national banks or corporations."
And insert:
"610. Contributions or expenditures by national banks, corporations, or labor organizations."

Page 104, strike out lines 4 to 21, inclusive, and insert:
"§ 610. Contributions by national banks, corporations, or labor organizations

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political con-

vention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer or any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, in violation of this section shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

"For the purposes of this section 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Page 117, line 8, strike out all after "receiver," down to and including "System," in line 15.

Page 118, line 18, strike out all after "care," down to and including "institution," in line 23.

Page 134, line 19, after "both" insert "; or if he negligently suffers such person to escape, he shall be fined not more than $500 or imprisoned not more than 1 year, or both."

Page 168, after line 12, insert "While any foreign government is a member both of the International Monetary Fund and of the International Bank for Reconstruction and Development, this section shall not apply to the sale or purchase of bonds, securities, or other obligations of such government or any political subdivision thereof or of any organization or association acting for or on behalf of such government or political subdivision, or to making of any loan to such government, political subdivision, organization, or association."

Page 807, strike out lines 15 to 18, inclusive, and insert "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

Page 415, line 10, after "Zone," insert "District of Columbia,"

Page 415, after line 17, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 418, after line 21, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 449, lines 24 and 25, strike out "the Revised Statutes (1 U. S. C., sec. 1)" and insert "Title 1 of the United States Code."

Page 456, strike out lines 2 to 21, inclusive.

Page 456, line 22, strike out "19" and insert "18."

Page 457, line 8, strike out "20" and insert "19."

Page 457, strike out lines 8 to 15, inclusive, and insert:

"SEC. 20. This act shall take effect September 1, 1948."

Page 457, line 16, strike out "22" and insert "21."

Page 468, about middle of page, strike out
[July 3......| 1328| 4, 8| 69,784, 789| 16| 706, 700]

Page 467, below middle of page, strike out
[June 10......| 634| 4| 49| 1854| 19| 705
Do......| 635| 1, 3| 49| 1857| 22| 343]
and insert:
"June 20......| 633| 1, 3| 49| 1857| 23| 348"

Page 470, after
"June 3......| 176| 1, 2, 4| 59,234, 235| 18| 241, 241a, 242"
insert:
"July 31......| 333| 6| 39| 510| 311| 504h"

Page 471, at the end of the schedule of repeals on this page, insert:
"1947—
Apr. 16.| 39|-----| 61| 82| 18| 411
May 16.| 73|-----| 61| 97| 18| 74th-1
June 21.| 111|-----| 61| 134| 16| 244
June 23.| 134| 304| 61| 169| 3| 251"

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

The Senate amendments were concurred in.

A motion to reconsider was laid on the table.

## NATIONAL FREEDOM DAY

Mr. REED of Illinois. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the joint resolution (S. J. Res. 37) requesting the President to proclaim February 1 as National Freedom Day, and ask for its immediate consideration. I have consulted with the leaders on both sides.

The Clerk read the title of the joint resolution.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

The Clerk read, as follows:

*Resolved, etc.,* That the President of the United States is authorized to issue a proclamation designating the 1st day of February of each year as National Freedom Day for the purpose of commemorating the signing by President Abraham Lincoln, on February 1, 1865, of the joint resolution adopted by the Senate and the House of Representatives of the United States, proposing the thirteenth amendment to the Constitution of the United States of America.

The joint resolution was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

## PERMISSION TO EXTEND REMARKS AT THIS POINT

Mr. McGARVEY. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. McGARVEY. Mr. Speaker, the bill which has been reached on the Consent Calendar today will authorize and request the President to proclaim February 1 as National Freedom Day and invite the people of the United States to observe the day with appropriate ceremonies and thanksgiving. As you all know, on February 1, 1865, President Abraham Lincoln signed the joint resolution, which had previously been adopted by the Congress, proposing the thirteenth amendment to the Constitution.

I should like to repeat for you at this time the immortal words of that amendment: "Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." These words are the foundation of our form of government with its emphasis on the freedom of the individual and the human liberties which belong to every citizen of the United States. It is therefore with pride in our free Nation that I introduced this resolution at the first session of the Eightieth Congress. Since that time I have been striving to obtain approval of the legislation.

I wish to thank the members of the Judiciary Committee and, in particular, the members of the subcommittee which handled the resolution, headed by the gentleman from Illinois [Mr. REED], for the interest and cooperation they have displayed in reporting the legislation, also the gentleman from Pennsylvania [Mr. CHADWICK].

I should like to pause here to pay tribute to the founder of National Freedom Day, Maj. R. R. Wright. It is regrettable that Major Wright is not with us today to realize the fulfillment of his long years of hard work and inspiring efforts. Born in slavery, Major Wright rose to prominence as a great American and occupied an unequalled position in the hearts of his fellow Americans. The story of Major Wright is truly the story of America, for in no other country today is it possible for a citizen to achieve such outstanding success. His success, however, would not have occurred had the thirteenth amendment to the Constitution not been approved. Since its signing is one of the cornerstones in the foundation of our American traditions, I am proud that we have today passed the resolution commemorating its inception.

## PROCUREMENT AND SUPPLY OF GOVERNMENT HEADSTONES

Mr. WELCH. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill (H. R. 4272) to provide for the procurement and supply of Government headstones or markers for unmarked graves of members of the armed forces dying in the service or after honorable discharge therefrom, and other persons, and for other purposes, with a Senate amendment thereto, and concur in the Senate amendment.

The Clerk read the title of the bill.

The Clerk read the Senate amendment, as follows:

Page 2, line 2, strike out all after "cemeteries," down to and including "costs," in line 14 and insert "The Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force are authorized and directed to compile a list of the names of all members of the armed forces of the United States who died while serving in such forces in the overseas theaters of operations on or after September 8, 1939, and whose bodies have not been recovered or identified or have been buried at sea. Upon the compilation of such list of names and other appropriate data, the American Battle Monuments Commission and the Secretary of the Army are authorized and directed to provide for the inscribing of each such name and pertinent

Case 1:08-cr-00055-RLV-DCK   Document 127-13   Filed 10/30/09   Page 10 of 10