UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

UNITED STATES OF AMERICA    )   DOCKET NO. 1:08-CR-55
                                   )
        vs.                 )
                                   )
KATHY RAY WAHLER, EDWARD     )
WILLIAM WAHLER, and LEWIS    )
VINCENT HUGHES,            )
                                 )
           Defendants.    )
_____)

TRANSCRIPT OF TESTIMONY OF RICHARD TURNER
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
NOVEMBER 13, 2009

<u>APPEARANCES</u>:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    MARK T. ODULIO
    United States Attorney's Office
    100 Otis Street
    Asheville, North Carolina

On Behalf of Defendant Kathy Wahler:

    KATHY RAY WAHLER

On Behalf of Defendant Edward Wahler:

    EDWARD WILLIAM WAHLER

On Behalf of Defendant Lewis Hughes:

    LEWIS VINCENT HUGHES

                  Cheryl A. Nuccio, RMR-CRR
                   Official Court Reporter
             United States District Court
                Charlotte, North Carolina

1                   P R O C E E D I N G S

2           MS. ROSE:  The government, Your Honor, would call

3  Richard Turner.

4                    RICHARD TURNER,

5  being first duly sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7  BY MS. ROSE:

8  Q.   If you would, please, sir, introduce yourself to the

9  jury.

10  A.   Hello.  I'm Richard Turner.  What else?

11  Q.   Where do you live, Mr. Turner?

12  A.   Oh, okay.  I live in Mooresville.

13  Q.   And what is your occupation?

14  A.   I'm an industrial designer.

15  Q.   And if you would, just -- what is your training and

16  education?

17  A.   Well, I have a degree in industrial design which is

18  basically product design.  Designing computers and enclosures

19  and things like that.  Plastic parts.

20  Q.   And how long have you been in that profession?

21  A.   Twenty-five years.

22  Q.   And, Mr. Turner, are you charged as a defendant in the

23  matter before the court?

24  A.   I am.

25  Q.   What were your charges?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

 1   A.   Conspiracy to aid in bank fraud.

 2   Q.   What is the status of your case?

 3   A.   I pled out.

 4   Q.   What does that mean?

 5   A.   That means I pled guilty to the conspiracy charge.

 6   Q.   With whom are you charged?

 7   A.   Kathy, Ed, and Lewis.

 8   Q.   You indicated that you entered a plea.  Were you

 9   represented by counsel?

10   A.   I am.

11   Q.   And were you advised of the charges against you?

12   A.   I was.

13   Q.   And what's the status of your case at this point since

14   you've entered your plea to these charges?

15   A.   I'm here to witness and that's all.

16   Q.   Have you been sentenced yet?

17   A.   No.

18   Q.   Are you awaiting sentencing?

19   A.   I have not been sentenced.

20   Q.   You indicated that you were charged with Ed Wahler, Kathy

21   Wahler, and Lewis Hughes.  Do you see first Kathy Wahler here

22   in the courtroom?

23   A.   Yes, I do.

24   Q.   Are you able to identify her?

25   A.   Yes.  She's right there (indicating).

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1   Q.   What is she wearing?

2   A.   Black blouse, gray pants.

3   Q.   Do you see Ed Wahler?

4   A.   I do.

5   Q.   Where is Ed Wahler?

6   A.   He is sitting right beside her in a green shirt.

7   Q.   Have you ever met Lewis Hughes personally?

8   A.   I have never met Lewis.

9   Q.   Have you spoken with him?

10  A.   I have spoken with him on the phone.

11          MS. ROSE:  If the record would reflect the

12  identification, Your Honor, of defendant Ed Wahler and

13  defendant Kathy Wahler.

14          THE COURT:  It will so reflect.

15  Q.   When did you meet Ed Wahler?

16  A.   I first met Ed back in '89.  He came to my business.

17  Q.   And where was your business located at that time?

18  A.   It was in Charlotte on More -- on Morehead Road.

19  Q.   And what was the nature of your introduction or your

20  meeting on that occasion?

21  A.   He was developing a product and he needed prototypes.

22  Q.   Did you know at that time or do you now know what Ed

23  Wahler's profession was or in what type of business he was

24  engaged?

25  A.   Yes.  He was -- he's an electrical engineer.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1  Q.   From that time did you two continue to have a business
2  relationship?
3  A.   Yes.
4  Q.   What was the nature of that relationship?
5  A.   Well, we developed multiple projects together.  Multiple
6  products together.
7  Q.   When you say you developed those products together, were
8  they successful endeavors?
9  A.   Yes, generally.
10  Q.   During the time period that you two worked together, did
11  you develop more than a professional relationship?
12  A.   Yes.
13  Q.   Describe that.
14  A.   Well, we were pretty good friends.  Went skiing together
15  and hung out together and we -- we spent a good bit of time
16  together.
17  Q.   How long were you engaged in a business relationship with
18  defendant Ed Wahler?
19  A.   Um...
20  Q.   You indicated the beginning of 1989.  How long did that
21  last?
22  A.   Until about a year and a half ago.
23  Q.   During that entire period, was your profession continuing
24  to be the same, that is, basically a product design engineer?
25  A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1  Q.   And was Mr. Wahler still working as an electrical

2  engineer?

3  A.   Yes.

4  Q.   At some point did you and defendant Ed Wahler have

5  discussions about the elimination of personal debt?

6  A.   Yes.

7  Q.   Do you recall when that occurred?

8  A.   We first started talking about that in probably 2003.

9  Q.   What were the circumstances?  What led you two to have a

10 discussion of that nature, if you recall?

11 A.   Well, Ed had had some pretty serious financial issues and

12 after 9/11 so did I.  We had a lot of debt and we were looking

13 for a way to eliminate it.

14 Q.   And as a result, what conversations did you have with

15 defendant Ed Wahler?

16 A.   Well, Ed was -- is an eternal researcher and he found a

17 seminar and went to it and thought it was good and thought I

18 should go to it.  So I did.

19 Q.   And as a result of what you learned, describe what you

20 began doing and what Ed Wahler began doing as well.

21 A.   Well, the seminar that we went to described a process by

22 which to eliminate your debt, primarily credit card debt.  And

23 it involved a number of letters and documents that were sent

24 out to get arbitration agreements and other things so as to

25 eliminate your credit card debt.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1 Q.   When you first heard about this procedure, what was your

2 initial reaction?

3 A.   Well, it was a little farfetched.

4 Q.   However, given the circumstances what did you do?

5 A.   Well, under the circumstances and based on the persuasion

6 of our instructors who claimed that it worked and they had

7 documentation therefor, it seemed like it was worth a try.

8 Q.   And did you, in fact, use some of this process which was

9 described to eliminate your debt?

10 A.   I did.

11 Q.   Can you describe generally what you did.

12 A.   Oh, we sent out -- I sent out a series of letters.  We --

13 it's been a long time.  But we ended up -- it was basically a

14 process that once it was over, you sent that process off to an

15 arbitration group.  Then they arbitrated it and found in your

16 favor and then you were to take that to the credit card

17 company and basically tell the credit card company that since

18 they didn't argue in the arbitration, that arbitration was

19 against them and that your credit card debt should be

20 eliminated at that point.

21 Q.   In engaging in this process, did you have discussions

22 with defendant Ed Wahler about it?

23 A.   Oh, sure.  All the time.

24 Q.   And when you say all the time, what was the nature --

25 what were the nature of those discussions?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   A.   Well, Ed and I used to talk almost every night on the

2   phone about one thing or another, and so we would just discuss

3   the process and how it was going and who had gotten what

4   letters back and if anything had happened.

5   Q.   After you engaged in this process for some period, what

6   did you learn?

7   A.   That it didn't work.

8   Q.   How did you learn that it didn't work?

9   A.   Well, it never eliminated any of my credit card debt.

10  Q.   What actually happened?

11  A.   Well, basically, everybody just ignored the documentation

12  and the arbitration agreements were deemed to be invalid, and

13  bottom line was there was no court that was willing to back it

14  up.

15  Q.   Did -- did you have -- as these failures were occurring,

16  did you discuss that with defendant Ed Wahler?

17  A.   Oh, sure.

18  Q.   What were your discussions?

19  A.   Well, we just discussed that it wasn't working and what

20  could we do.  It wasn't working.  And why -- you know, it just

21  wasn't working.

22  Q.   At the point that you had these discussions with

23  Mr. Wahler, did he continue in the process?

24  A.   Well, it was a continuing process forever.  Always trying

25  to find something to make whatever wasn't working work.  And

1   Ed continued to do that.

2   Q.   Did you continue to do that?

3   A.   We did -- I did a little bit more, but basically when it

4   quit working, I got out of it.

5   Q.   Did you -- when you determined it wasn't working, wanted

6   to get out, did you warn Ed Wahler?  Did you have serious

7   discussions with him concerning moving forward with this

8   procedure?

9   A.   Well, I just told Ed that it wasn't working and that I

10  was going to get out.  That I was going to liquidate my 401K

11  to pay off my credit card debts and that I thought that we

12  should get back to designing products, which is what we were

13  good at, and get away from the rest of this stuff.

14  Q.   As a result of those discussions, what did Ed Wahler do?

15  A.   Well, Ed was much more seriously involved in the

16  processes than I was.  And he agreed with me that we should

17  get back into product development, but that he had to get some

18  other things squared away first.

19  Q.   During the time that you were discussing this with

20  defendant Ed Wahler, at some point did you encounter defendant

21  Lewis Hughes?

22  A.   Lewis -- I had a legal case against me, against my

23  company, and Lewis and Ed and I were involved in trying

24  litigate that case.

25  Q.   During the time that -- you testified earlier, you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  referred to defendant Ed Wahler as an eternal researcher.

2  A.    Yes.

3  Q.    What did you mean by that statement?

4  A.    Well, he's -- he has a unique ability to retain a lot of

5  information and he searched the internet continuously and

6  looked for answers and solutions to the legal issues at hand.

7  Q.    Are you talking about resolutions or answers and issues

8  to the fact that this was not working or being accepted by any

9  financial entity?

10 A.    Well, it was always more in line with so if the courts

11 aren't accepting this, what can we do to get them to accept it

12 or what legal juke can we do to make this work.

13 Q.    During this time did you participate in any phone

14 conversations or discussions related to this debt elimination

15 scheme?

16 A.    We -- we talked about it quite a bit over lunch and other

17 times.  I'm not sure if I'm answering your question.

18 Q.    Well, did you hear about call-in discussions or trainings

19 that were conducted weekly via telephone?

20 A.    There were a number of 800 numbers that you could call in

21 and there would be like conference calls that were set up and

22 most of it -- it was people that were predominantly involved

23 in some sort of a legal issue and then there were people on

24 the talk that would try to point them into ways to resolve

25 their issues.

RICHARD TURNER - DIRECT

1  Q.   And who -- who generally directed those group
2  discussions?
3  A.   Well, I know that Ed and Lewis both were involved in some
4  of those.  I mean, not all of them, but some of them.
5  Q.   Did they provide information and answers to those who
6  would call in with particular issues related to legal problems
7  or debt issues?
8  A.   Well, they would -- they would listen to people
9  describing their problems and try to point them in a direction
10 that might help get it resolved.
11 Q.   Would it be fair to say that both of them had a
12 significant understanding of this procedure and legal
13 procedures?
14 A.   Oh, yes.  They had a great understanding of what they
15 thought they were trying to do.
16 Q.   I'm going to show you three different documents.
17        MS. ROSE:  If I may approach the witness, Your
18 Honor?
19        THE COURT:  Yes.
20 Q.   Mr. Turner, first I would show you what's been marked as
21 Government's Exhibit 23 and ask if you're able to identify it.
22 There's numerous pages to that document.  If you would take a
23 look at all of it.
24 A.   Yes, I see it.  I understand it.
25 Q.   Are you able to -- what is this particular document?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1   A.   It's Kathy Wahler's declaration and treaty of peace to
2   the world.
3   Q.   And did you have any role in either the preparation or in
4   any way in this document?
5   A.   Yeah.  Ed came down to my company where I had a big
6   copier and a big conference room table and we copied them all.
7   And my role in this was to witness the certificate of service
8   insofar as I was not involved with this particular document
9   other than that.  But we -- we laid them out, put them in
10  envelopes, and got them ready to mail.
11  Q.   If I -- the last page of Government's Exhibit 23, what is
12  the caption on the last page of the exhibit?
13  A.   The caption?  Certificate of service.
14  Q.   And is that signed by anyone?
15  A.   Yes.  I signed it.
16  Q.   Show you Government's Exhibit 26.  Ask you again to
17  review that particular document, sir.
18  A.   Okay.
19  Q.   Are you able to identify this exhibit or are you familiar
20  in any way with it?
21  A.   It appears to be part of the process that was used.
22  Q.   And does your signature or your name appear anywhere
23  within Government's Exhibit 26?
24  A.   No.  My name does, but my signature doesn't.
25  Q.   Is it signed?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1   A.   The certificate of service is signed, but I didn't sign

2   it.

3   Q.   Do you recognize the signature there?

4   A.   I don't.

5   Q.   But it's not your signature.

6   A.   It's not.

7   Q.   Do you know who signed that as your signature?

8   A.   I don't really recognize that -- that signature.

9   Q.   But is that your name and address that appears thereon?

10  A.   Yes.

11  Q.   Is it the same name and address that appears on the

12  previous document which you identified, that being

13  Government's Exhibit 23?

14  A.   I'll have to look, but I think it is.

15       Yes, it is.

16  Q.   And finally, I'm going to show you what has been marked

17  as Government's Exhibit 120.

18  A.   Yes.

19  Q.   Are you able to identify Government's Exhibit 120?

20  A.   It's a certificate of service as well.

21  Q.   Does it have a signature on it?

22  A.   It does have a signature on it.

23  Q.   The signature appears above what name?

24  A.   It appears -- it's supposed to be my signature.

25  Q.   Is it your signature?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1   A.   It is not.

2   Q.   Do you recognize the handwriting?

3   A.   I would -- I would guesstimate that that's Ed's

4   handwriting.

5   Q.   Is this a document that you actually signed?

6   A.   No.

7   Q.   The mailing address above that is what?

8   A.   It's my mailing address.

9   Q.   Do you recognize that address?

10  A.   Yes.

11  Q.   And is that the address that you used on the other

12  documents --

13  A.   Yes.

14  Q.   -- which you submitted in furtherance of the scheme?

15  A.   Yes.

16          MS. ROSE:  Your Honor, at this time the government

17  would move to admit Government's Exhibits 23, 26, and 120.

18          THE COURT:  Let them be admitted.

19          (Government's Exhibits Nos. 23, 26, and 120 were

20  received into evidence.)

21          MS. ROSE:  And, Your Honor, the other documents that

22  I would be publishing to Mr. Turner have already been admitted

23  by the court through previous witnesses.

24  Q.   Government's Exhibit 23 which you just identified,

25  Mr. Turner.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1  A.  Yes.

2  Q.  On the last page of the certificate of service, is that

3  your signature, sir?

4  A.  Yes, it is.

5  Q.  Do you know what the -- what the significance of the

6  certificate of service was to this debt elimination scheme?

7  A.  Well, in our understanding at the time, any legal court

8  related document needed a certificate of service to verify

9  what was mailed and who it was mailed to.  And that was the

10  whole point.

11  Q.  And was it also part of this procedure that a number of

12  individuals, individuals not related in particular to your

13  debt elimination, would be notified of these documents that

14  were being filed?

15  A.  Well, everybody that's listed on the certificate of

16  service was essentially notified or mailed a copy.

17  Q.  Do you know the purpose of that?

18  A.  Well, it was to notify -- in this case it was to notify

19  all these individuals of Kathy Wahler's treaty of peace to the

20  world.

21  Q.  Show you what's been previously admitted as Government's

22  Exhibit 27.

23       MS. ROSE:  If I may approach.

24  Q.  I'm going to show you -- it's not scanned on the screen

25  here.  I'm going to ask you to identify the last page of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1  Government's Exhibit 27.  Are you able to identify that
2  particular document?
3  A.    That's the one we just looked at.
4  Q.    And it's entitled what?
5  A.    Certificate of service.
6  Q.    And does your name appear thereon?
7  A.    It does.
8  Q.    And is this one that you signed?
9  A.    It is not.
10  Q.    All right.  Do you recognize that signature?
11  A.    I do not.
12  Q.    You testified earlier that you were able to recognize
13  what you believed to be Edward Wahler's signature.  Does this
14  appear to be Edward Wahler's signature -- or Edward Wahler's
15  handwriting of your signature?
16  A.    It could be.  The other one I'm sure of.  This one I'm
17  not positive of, but it could be.
18  Q.    All right.  Is this the document which you just
19  identified, Mr. Turner?
20  A.    Yes.
21  Q.    How frequently were you assisting in these certificates
22  of service?
23  A.    Not -- not real frequently.  We did -- we did this
24  round -- we may have done another round or two.  The idea was
25  you needed somebody that was not involved in the case.  So,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   you know, I wasn't involved so I signed them for Ed.

2   Q.   Show you what's been previously marked as Government's

3   Exhibit 133.  Do you recognize that signature?

4   A.   Yes.  That's my signature.

5   Q.   As part of the scheme in which you and the other

6   defendants were involved, did you -- what -- what was the

7   process of the mailing of these instruments?

8   A.   You put all the pieces together.  Each -- each part of

9   the process had a series of documents or photocopies of

10  documents that needed to go out to certain people and you

11  would assemble all that information, sign the certificates of

12  service, put it in an envelope and take it to the post office

13  and send it registered mail or certified mail.

14  Q.   And do you know the significance of sending it by

15  registered or certified mail?

16  A.   The only significance I'm aware of was that it allowed us

17  to be sure that it got there.

18  Q.   And it was important -- was it part of the scheme that

19  there were numerous notices sent to individuals based upon a

20  response or lack thereof?

21  A.   Yes.

22  Q.   And was it important in furtherance of the scheme to be

23  able to record when certain items were mailed such that a

24  follow-up document could then be sent?

25  A.   Correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1    Q.   Fair to say that there were numerous documents that were
2    involved in any one transaction?
3    A.   Oh, yes, quite a few.
4    Q.   When did you learn that you had been charged in this
5    case?
6    A.   June 12th of '08.
7    Q.   How did you learn about the charges?
8    A.   I was served a subpoena -- or summons or whatever you
9    call it.
10   Q.   When you received that document, what did you do?
11   A.   I called Ed.
12   Q.   And why did you call -- when you say Ed, to whom are you
13   referring?
14   A.   Ed Wahler.
15   Q.   Why was it your first reaction to call defendant Ed
16   Wahler?
17   A.   Well, I figured if anybody knew what was going on, he
18   would since he was listed on it as well.
19   Q.   When you called Mr. Wahler, what did he say?
20   A.   He said he hadn't heard of it.  He didn't know anything
21   about it; to fax him a copy and we'd look it over.
22   Q.   Did you do that?
23   A.   I did that.
24   Q.   After you faxed a copy, then what happened?
25   A.   He read it over.  We talked about it for a very short

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1  period of time.  And he said that it was an indictment by
2  grand jury.  That I was one of the indicted and that there
3  were several counts against me as well as him and that, you
4  know, I just -- I just needed -- I asked him what I was to do
5  about this and he said I should do whatever I needed to do to
6  get out of it and to tell the truth.
7  Q.   What did he indicate he was going to do?
8  A.   He really didn't indicate what he was going to do.
9  Q.   Did you have further contact with defendant Wahler after
10 this occasion?
11 A.   I talked to Ed several times.  He was -- they arrested
12 him a couple of days later and I talked to him several times
13 from jail.
14 Q.   Did -- as a result of those conversations, did defendant
15 Ed Wahler give you any particular instructions?
16 A.   As to what I should do?
17 Q.   As to anything that you could do to assist him.
18 A.   Well, at one point Ed was unable to get outside of the
19 area code, which I was in that area code, so he called me and
20 had me forward or put in a -- put together a conference call
21 so he could talk to people outside of the area code.
22 Q.   Did you know who you placed him in contact with?
23 A.   I believe I placed him in contact with his mom, with
24 Kathy and the kids, and with Jim MacAlpine.
25 Q.   Did you ever -- and who is Jim MacAlpine, do you know?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - DIRECT

1  A.   Jim's just a guy that kind of worked with Ed, was friends

2  with Ed through the Patriot group and I knew little of Jim.

3  Q.   Had you met this individual Jim MacAlpine before?

4  A.   Yes, we had met, I'm sure, at a meeting or two, and I

5  think he was at one of Ed's trials.

6  Q.   What -- what kind of meetings did you meet Jim MacAlpine

7  at?

8  A.   Well, they called them Patriot group meetings.

9  Q.   What took place at these particular meetings?

10  A.   Well, they were held at local steakhouses and they talked

11  about various government issues and sometimes legal stategies

12  and other sordid legal things.

13  Q.   Were you a regular attendee at these meetings?

14  A.   No.

15  Q.   Following the indictment, did you have contact with

16  defendant Hughes?

17  A.   By e-mail, yes.

18  Q.   What were the circumstances?

19  A.   I -- Jim MacAlpine got defendant Hughes to send me a

20  couple e-mails regarding how I might handle this case.

21  Q.   At some point following your learning of the charges

22  here, had you retained your attorney?

23  A.   Yes.

24  Q.   And following that, did you and your attorney speak with

25  agents from the FBI?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  A.  Yes, we did.

2  Q.  As a result of speaking to agents with the FBI, did they

3  request any assistance from you?

4  A.  Yes, they did.

5  Q.  In what way?

6  A.  They were trying to find Lewis.  They wanted me to assist

7  in that endeavor.

8  Q.  And as a result, what did you do?

9  A.  I talked -- I went to the FBI's office and we had a

10  conference -- or a call -- put in a call through to Jim

11  MacAlpine.  And I told Jim that I was trying to figure out

12  what to do with this whole situation and that I knew that

13  Lewis was still free and that I needed his assistance and

14  would Jim please help me get in contact with Lewis, either

15  with a phone or an e-mail or something.

16  Q.  And were you provided a mechanism by which you were able

17  to communicate with defendant Hughes?

18  A.  Jim was able to get Lewis's permission to give me his

19  e-mail address and I e-mailed him several times.

20  Q.  Did you provide that information, then, to the FBI?

21  A.  I did.

22       MS. ROSE:  All right, sir.  Thank you.  I don't have

23  any other questions.

24                  CROSS EXAMINATION

25  BY DEFENDANT KATHY WAHLER:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - CROSS

1   Q.   In all of these years of knowing Ed and myself, did you

2   ever know of me participating in any of these discussions,

3   these seminars, telephone calls, any of that?

4   A.   No.

5   Q.   Did you ever see me prepare any of the documents?

6   A.   No.

7   Q.   You actually saw Ed tell me to sign them, did you not?

8   A.   Probably.

9   Q.   Did you -- do you believe that I ever had a real

10  understanding of any of the paperwork or the processes that --

11  that you and my husband had on conversations?

12          MS. ROSE:  Objection.

13          THE COURT:  Overruled.

14  A.   So I have to answer?

15  Q.   Sorry.

16  A.   I don't believe -- I don't believe that you had a good

17  understanding of what was going on, no.

18  Q.   Do you believe I just did what Ed told me to do?

19  A.   Yes.

20  Q.   Did I participate in any of the preparations of the

21  packages that you and my husband put together?

22  A.   Not the ones that I was involved in.

23          DEFENDANT KATHY WAHLER:  That's all.  Thank you.

24                  CROSS EXAMINATION

25  BY DEFENDANT EDWARD WAHLER:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Q.   Mr. Turner, did you attend a seminar put on by Todd

2  Pelletier?

3  A.   I did.

4  Q.   Did you see presented at that seminar -- well, let me

5  back up a minute.  You're an industrial designer?

6  A.   I am.

7  Q.   As part of your work, did you build prototypes to prove

8  out certain mechanical theories that things would work,

9  operate as you expected?

10  A.   Yes.

11  Q.   Could you term that a scientific process?

12  A.   I guess you could do that.

13  Q.   Prove a theory, test it.

14  A.   Yes.

15  Q.   Okay.

16  A.   That's fine.

17  Q.   So then, would you consider yourself to have a logical

18  mind?

19  A.   Yes.

20  Q.   Okay.  So at these -- this seminar which was -- do you

21  remember how long it was?

22  A.   I think it was two days.

23  Q.   Two days, okay.  Was evidence, strategems, legal theories

24  presented to you to your satisfaction that seemed legitimate?

25  A.   They spent two days presenting legal arguments and legal

1  theories.  And by the end of the two days, although it seemed

2  a little farfetched in the beginning and probably still did

3  seem to be too good to be true, it looked like it was worth a

4  try.

5  Q.   Are you familiar with the term mens rea?

6  A.   What?

7           MS. ROSE:  Objection.

8           THE COURT:  Overruled.

9  Q.   Mens rea.

10  A.   No.

11  Q.   Can you see that?

12  A.   No, I have a blank screen.

13       Oh, there you go.

14  Q.   Now do you see it?

15  A.   Yes.

16  Q.   Okay.  Do you see where it says mens rea?

17           MS. ROSE:  Objection, Your Honor.

18           THE COURT:  Well, for what purpose are you seeking

19  to show this definition to him?

20           DEFENDANT EDWARD WAHLER:  Because it goes to state

21  of mind, sir.

22           THE COURT:  Well, if the jury is asked to determine

23  something about mens rea, that will be a legal matter and this

24  individual has not been shown to be a legal expert and he

25  doesn't know what the term means.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - CROSS

1           DEFENDANT EDWARD WAHLER:  That's why I want him to
2    see the definition so we can discuss it.
3           THE COURT:  No, that's -- objection sustained.
4           DEFENDANT EDWARD WAHLER:  All right.
5    Q.   When you say it seemed like it was worth a try, did it
6    seem like you would be committing any crime doing it?
7    A.   No.
8    Q.   Did it seem to you from the evidence you were presented
9    of what has happened in this country particularly since 1933,
10   that you had a first amendment right to protest some of those
11   things that had happened?
12   A.   Do you want to rephrase that question?
13   Q.   All right.  Were things presented to you that you
14   considered believable and proven to you that upset you about
15   the financial system in this country?
16   A.   There's -- I've been exposed to a lot of historical
17   evidence presented by various people that pointed to some
18   things that I don't think maybe should be -- should have
19   happened in this country, but I have no real hard evidence to
20   say that they did happen or they didn't happen.
21   Q.   Okay.  In the conference call that you participated in
22   and the Patriot meetings that you described, did anyone ever
23   suggest anyone violate any law as they understood it?
24   A.   No.
25   Q.   If someone had advised you to violate a law, would you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   have?

2   A.   No.

3   Q.   Were, on the discussions and the seminars, et cetera, the

4   idea of an affidavit presented to you?

5   A.   Yes.

6   Q.   What is your understanding of the use or power of an

7   affidavit?

8   A.   Well, an affidavit is a document which contains

9   statements that you feel are truthful and you sign that

10  document stating that they are, to the best of your knowledge,

11  truthful.

12  Q.   And how about if an affidavit goes unanswered point for

13  point?

14  A.   I'm not a lawyer.

15  Q.   I'm just asking what you understood or were taught or

16  shown.  Do you have any recollection?

17  A.   It's fuzzy at best, but if -- if it went unanswered, then

18  you would assume that the other party was agreeing to the --

19  to the affidavit.

20  Q.   Okay.  Were you called by FBI Agent Andy Romagnuolo prior

21  to being indicted?

22  A.   Yes.

23  Q.   Were you made aware of his activities in the western

24  North Carolina area for some period of years through

25  discussions with the Patriot group and with me?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - CROSS

1   A.   Yes.

2   Q.   To the best of your knowledge, when did all of the

3   processes to eliminate debt end that you and I engaged in?

4   A.   When did they end?  When did we quit messing with them?

5   Q.   Yes.

6   A.   As far as eliminating debt, credit card debt, let's see.

7   2003, 4.

8   Q.   Okay.  Do you know what I was advising people after that

9   date with respect to those processes?  Did you ever hear me on

10  a call or talk to somebody about them?

11  A.   I don't recall specifically.

12  Q.   Okay.  So you don't recall me saying don't do it?

13          MS. ROSE:  Objection.

14          THE COURT:  Sustained.

15  Q.   Never mind.  You don't have to answer that.

16      At the time of what I consider my kidnapping, did -- what

17  were we involved with technically?  What project had we

18  started working on?

19  A.   We were working on a gas saving device for better fuel

20  economy.

21  Q.   A hydrolyzer, right?

22  A.   Yeah.

23  Q.   Make hydrogen from water.  And that was an undertaking to

24  do what?  Well, you can't answer that.

25      You had mentioned earlier that we needed to get back to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   engineering, making products, correct?

2   A.   Yes.

3   Q.   Had we pretty much agreed to go do that?

4   A.   You had agreed -- I mean, I was in total agreement with

5   it and you were -- you were in agreement with it as well.  You

6   just wanted to -- you just had to get some things finalized

7   because of the heat that Andy was putting on you.

8   Q.   Okay.  Do you know what steps I took to do that?  Matter

9   of fact, the three of us sitting here with Jim MacAlpine.

10  A.   I believe you put together a lawsuit against Andy.

11  Q.   Okay.  Did you know me to believe in the sanctity of the

12  courts to solve problems?

13  A.   You told me that you believed in them.

14  Q.   Okay.  So if I went to court to prove it, that would seem

15  to be indicative of that belief, wouldn't you think?

16  A.   Yes.

17  Q.   Okay.  On June 12th, 2008, almost 17 months ago, do you

18  recall something I told you about that lawsuit?  What happened

19  in DC on that very day as well?

20  A.   I don't remember the exact deal, but basically my

21  recollection was that the lawsuit had not been answered in

22  over 60 days and that once you were incarcerated virtually the

23  same day, the court ordered a show cause order for you to come

24  in and show why you sued him or something to that nature.

25  Q.   Okay.  Do you recall me saying that the default had been

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - CROSS

1  docketed in DC?

2  A.    I don't recall that specifically, but...

3  Q.    Okay.

4  A.    You may have.

5  Q.    Have you known me to engage in illegal activity?

6        MS. ROSE:  Objection.

7        THE COURT:  Sustained.

8  Q.    When you asked me what you should do, did I advise you to

9  go ahead and testify if you needed to?

10  A.    You told me to do whatever I needed to do to get out of

11  this problem.

12  Q.    Okay.  Do you feel like to this day you committed a

13  criminal act?

14  A.    I did participate in the mailing of these documents.

15  That's what I did.

16        DEFENDANT EDWARD WAHLER:  All right.  Do you have

17  some questions?  I'll let you go.

18                    CROSS EXAMINATION

19  BY DEFENDANT HUGHES:

20  Q.    Hello, Richard.

21  A.    Hello, Lewis.

22  Q.    I like your haircut.

23  A.    Thanks.  I like yours too.

24  Q.    Back in the days when Ed and I used to participate in

25  some conference calls, do you remember who the host of those

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - CROSS

1    calls was?

2    A.    I do not.

3    Q.    Okay.  Do you remember the question of the -- during

4    those calls, do you remember if the question of the processes

5    and actions to be taken which were discussed on the call

6    having ever been described as illegal or do you remember the

7    question of legality ever coming up on any of those calls?

8    A.    As to whether or not the actions that you were suggesting

9    were illegal?

10    Q.    Or any of the other participants suggested were illegal,

11    yes.

12    A.    No.

13    Q.    Okay.  Thank you.

14          Do you remember -- well, let me see.  Were you still

15    participating in the calls in November of 2003 when Ed and I

16    made the announcement we would no longer participate in them?

17    A.    I was very rarely on any of the calls.

18    Q.    Yeah, I couldn't remember whether you were or not.

19    A.    But -- so I don't recall.

20    Q.    Okay.  Do you know if you were participating on the -- on

21    the -- any of the -- I think there were three of them where Ed

22    and I advised everyone on the call that we were no longer

23    going --

24          MS. ROSE:  Objection.

25          THE COURT:  Overruled.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - CROSS

1    Q.   That we were no longer going to participate in the calls

2    and that we were going to do our absolute best to go strictly

3    by the letter of the law and seek our remedies in courts of

4    law?

5    A.   I cannot recall.

6    Q.   Okay.  That's fine.

7    A.   Sorry.

8         DEFENDANT HUGHES:  Could we get Government's Exhibit

9    23 up for -- it's late in the day, my sugar is low, and I'm

10   having trouble staying focused here, I'm sorry.

11        Could we get Government's Exhibit 23A up for a

12   moment, please.

13   Q.   Okay.  We looked at this document a couple of times.

14   Given the state of affairs that we're in at the moment, do you

15   think that there's anything in this document that is illegal?

16        MS. ROSE:  Objection.

17        THE COURT:  Overruled.

18   A.   I am no attorney.  I wouldn't have a clue.

19   Q.   Okay.  That's fine.

20        Do you think that your sending the document to the

21   various parties that are listed on the certificate of service

22   was an illegal act?

23   A.   If I had thought that was the case, I would not have done

24   it.

25   Q.   Okay.  Do you think today that that was an illegal act,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - REDIRECT

1    is what I actually meant to ask.  I'm talking about this one

2    specific document only.  Not any of the others.

3    A.   I do not have the legal background to answer that

4    question.

5         DEFENDANT HUGHES:  That's fine.  Okay.  Thank you,

6    Richard.

7         THE COURT:  Redirect.

8                   REDIRECT EXAMINATION

9    BY MS. ROSE:

10   Q.   Is it -- would you describe what occurred -- you referred

11   to these Patriot meetings.  What is a Patriot meeting and what

12   happened at these Patriot meetings?

13   A.   Well, there's a group of people, I describe them like dog

14   people or -- you know, I mean, they just -- their thing is to

15   look at the status of the government and what's going on and

16   things that happened in the past and wrongs that they feel

17   have wronged them and they meet and they talk about them.

18   Q.   Do they do more than just meet and talk about those

19   things?  Do they disavow certain citizenships?

20   A.   They -- disavow.  In the Patriot movement, they see

21   things significantly different than you do.  And so they --

22   they see that there's -- they think there's a difference

23   between citizenships in this country and they disavow the ones

24   that they don't feel are correct.

25   Q.   And do they take a position on the United States, whether

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   it's the United States a country or whether it's a

2   corporation?

3   A.   They feel it's a corporation.

4   Q.   Therefore, if the law says it's the United States, they

5   wouldn't think it would be illegal to call it a corporation,

6   would they?

7   A.   No.

8   Q.   If you don't believe in the laws, can you believe -- or

9   you believe in another set of laws other than the prevailing

10  law in the United States and you believe your law as opposed

11  to the prevailing law, how can -- how can you make

12  determinations about what's legal and illegal?

13          THE COURT:   Sustained.

14  Q.   As a part of these Patriot network meetings, did -- and

15  this corporate United States issue, were taxes discussed?  The

16  payment of taxes?

17  A.   Oh, yes.

18  Q.   And was it a common theory that you could claim not to be

19  a resident and you wouldn't have to pay your taxes?

20  A.   I'm not so sure about that theory.  There were a lot of

21  others.

22  Q.   Like what?

23  A.   Well, the prevailing theory was that taxes -- taxes --

24  you shouldn't have to pay any taxes on your labor.  That there

25  were taxable things that you did have to pay taxes on, but

1    your hard -- your sweat -- blood and sweat labor was not

2    taxable.

3    Q.    Do members of the Patriot network have, for instance,

4    North Carolina license plates?

5    A.    Yes.

6    Q.    Did Ed Wahler have a North Carolina license plate?

7    A.    Yes.

8    Q.    At any point did he have a license plate called the North

9    Carolina American Republic plate?

10   A.    I believe he did.

11   Q.    And was that plate the one that he used on his vehicle?

12   A.    I know that he -- that the plates existed.  I do not know

13   if he actually used it or not.

14   Q.    But is that a common theory of removing yourself from the

15   jurisdiction of the United States?

16   A.    Yeah, the basic idea was to remove yourself from the

17   jurisdiction of the corporation -- corporate United States.

18   Q.    And the individuals that led the training sessions that

19   you attended, were those individuals those who held similar --

20   based upon what they were telling you, similar beliefs to the

21   Patriot network individuals?

22   A.    Yes, sure.

23   Q.    And as part of this training you received, there were

24   certain aspects of the government that really didn't exist or

25   that weren't legal or were corporate or not corporate.  Is

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   that fair to say?

2   A.   Yes.

3             DEFENDANT HUGHES:  Mr. Voorhees, could I be excused

4   for a few minutes?  I've got a problem.

5             THE COURT:  Yes, sir.

6             DEFENDANT HUGHES:  Thank you.

7             THE COURT:  Members of the jury, you may step out.

8             Wait just a minute.

9             Go ahead and step out.  We'll call for you in just a

10  moment.

11            (Jury exited the courtroom.)

12            DEFENDANT HUGHES:  I'm sorry to interrupt, but it's

13  pressing.

14            THE COURT:  All right.  Go ahead.

15            DEFENDANT HUGHES:  Thank you, sir.

16            (Defendant Hughes exited the courtroom.)

17            THE COURT:  I take it he should be back shortly.

18            THE MARSHAL:  Shortly, judge.

19            DEFENDANT EDWARD WAHLER:  Yes, Your Honor, he's been

20  having gastro internal distress all day.

21            (Defendant Hughes returned to the courtroom.)

22            THE COURT:  Okay.  Mr. Lewis Hughes is back.

23            How much longer do you intend --

24            MS. ROSE:  Very, very -- one or two questions, Your

25  Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - REDIRECT

1        THE COURT:  All right.  May we have the jury back.

2        DEFENDANT HUGHES:  I apologize for the interruption.

3        THE COURT:  I understand.

4        DEFENDANT HUGHES:  I just can't help it.

5        THE COURT:  And it's not Mr. Voorhees; it's Judge

6   Voorhees.

7        DEFENDANT HUGHES:  It's what?

8        THE COURT:  Judge Voorhees.

9        (Jury entered the courtroom.)

10                    RICHARD TURNER

11           REDIRECT EXAMINATION (Cont'd.)

12   BY MS. ROSE:

13   Q.   You were asked on cross examination whether you believed

14   you were doing anything illegal; is that correct?

15   A.   Yes.

16   Q.   You said you didn't.

17   A.   At the time I did not feel like I was doing anything

18   illegal.

19   Q.   Why did you enter a plea of guilty?

20   A.   I entered a plea of guilty because I was guilty of

21   conspiring against -- and so far as I signed these documents,

22   I was part of the mailing, as was described by my attorney.

23        MS. ROSE:  All right.  Thank you.

24        THE COURT:  You had another question?

25        DEFENDANT EDWARD WAHLER:  Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD TURNER - RECROSS

1                THE COURT:  Go ahead.

2                         RECROSS EXAMINATION

3  BY DEFENDANT EDWARD WAHLER:

4  Q.   Was it explained to you at any time that if you went to

5  trial, you could get a lot of years?

6                MS. ROSE:  Objection.

7                THE COURT:  Overruled.  Excuse me, I'll sustain

8  that.

9                DEFENDANT EDWARD WAHLER:  Oh.

10 Q.   When you met with your attorney, what did he tell you

11 about your case?

12               MS. ROSE:  Objection.

13               THE COURT:  Sustained.

14                        RECROSS EXAMINATION

15 BY DEFENDANT HUGHES:

16 Q.   When you went to the Patriot meetings, which I've never

17 had the pleasure of going to, but when you went to those, did

18 you -- and also on the conference calls, did you hear people

19 often refer to Title 28 of the United States Code

20 Section 3002, paragraph 15, which says the United States is a

21 federal corporation?

22 A.   I do not -- I do not recall numbers and phrases like that

23 very well at all.

24               DEFENDANT HUGHES:  Oh, okay.  That's fine.

25               THE COURT:  All right.  Thank you.

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I certify that the foregoing transcript is a true

7  and correct transcript from the record of proceedings in the

8  above-entitled matter.

9

10          Dated this 21st day of November, 2009.

11

12

13                              s/Cheryl A. Nuccio
                                Cheryl A. Nuccio, RMR-CRR
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

                Cheryl A. Nuccio, RMR-CRR (704)350-7494